# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

WESLEY SINE,
              *Defendant-Appellant.*

No. 05-10575

D.C. No.
CR-02-00079-FCD

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, District Judge, Presiding

Argued and Submitted
September 11, 2006—San Francisco, California

Filed May 1, 2007
Amended July 17, 2007

Before: Betty B. Fletcher and Marsha S. Berzon,
Circuit Judges, and David G. Trager,* District Judge.

Opinion by Judge Berzon

---

*The Honorable David G. Trager, Senior United States District Judge
for the Eastern District of New York, sitting by designation.

**COUNSEL**

Russell A. Cline, Crippen & Cline, Salt Lake City, Utah, for the defendant-appellant.

John K. Vincent, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

**ORDER**

The government's Motion to Change Wording of Opinion is GRANTED. The opinion filed on May 1, 2007 is hereby amended as follows:

1) On slip op. 4792, the final two sentences of the paragraph beginning "This appeal arises . . ." are replaced with: "Such use of the judge's statements both created far too great a danger of unfairly prejudicing Sine and introduced impermissible hearsay into the trial."

2) On slip op. 4795, the sentence beginning "Also, Sine sued . . ." is replaced with: "Also, Sine sued Meddles and Delmarva in Utah again in 2001, this time in both state and federal court, along with two entities, Polly & Co. and Hare & Co., that were the true owners of the Ginnie Mae securities referenced in the transfer forms."

3) On slip op. 4811, the sentence beginning "Sine argues . . ." is replaced with: "Sine argues that bringing the adverse,

derogatory factual findings and comments in Judge Carr's opinion before the jury created too great of a danger of unfair prejudice and thus violated Rule 403 of the Federal Rules of Evidence."

\* \* \*

The panel has unanimously voted to deny defendant's petition for rehearing. Judge Berzon has voted to deny the petition for rehearing en banc. Judge B. Fletcher and Judge Trager have recommended denial of the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The defendant's petition for rehearing or rehearing en banc is DENIED. No further petitions for rehearing or rehearing en banc will be accepted.

---

## OPINION

BERZON, Circuit Judge:

Defendant Wesley Sine, a Utah lawyer, helped run a pyramid scheme that defrauded victims of more than two million dollars. Sine's role in the scheme was to reassure individuals that they were lending money to a legitimate real estate investor and that millions of dollars in legitimate collateral protected them in case of default. Once the scheme started to unravel and it became clear that the collateral was worthless, Sine began to weave a "good faith" defense to his actions, claiming that it was as much of a surprise to him as to anybody else that the collateral was illusory. To give credence to this story, Sine filed a number of lawsuits that purported to be

seeking recovery of the value of the collateral. Ultimately, however, these lawsuits just added to Sine's troubles: An Ohio federal district court rejected his factual claims, enjoined his recovery efforts, held him in contempt, and denounced on the record his "chicanery, mendacity, deceit, and pretense."

This appeal arises from the criminal prosecution of Sine and his co-defendant Darra Panthaky, the mastermind of the fraud scheme, commenced in a California federal district court after the scheme unraveled.[1] During cross-examination of various defense witnesses — including Sine, who testified in his own defense — the government repeatedly referred to the factfinding and derogatory character assessments of the Ohio court. By doing so, the government created a substantial risk that the jury would pay undue and unwarranted attention to the strongly adverse assessment of a figure, the Ohio judge, who never appeared in the courtroom but who the jury likely assumed had both authority and expertise with regard to determining the true course of events and to making credibility determinations. Such use of the judge's statements both created far too great a danger of unfairly prejudicing Sine and introduced impermissible hearsay into the trial.

Sine did not, however, object during the trial to the use of the judge's observations. The government presented such strong admissible evidence of his guilt that, even without considering the Ohio court's decision, we cannot find plain error warranting reversal. We therefore affirm.

## I.

Panthaky masterminded a wildly imaginative, bizarrely complex pyramid scheme in the late 1990s and early 2000s: First, he convinced victims that they were lending money to

---

[1]We deal with Sine's non-evidentiary claims, as well as the claims of Panthaky, in a memorandum disposition filed concurrently with this opinion.

fund various real estate projects conducted by Alpha Funding Group, Inc. ("Alpha"), of which Panthaky was president. In making his pitch, Panthaky represented himself as a wealthy international financier and humanitarian who had led Alpha to great success, and promised potential "lenders" between twenty and one hundred percent interest on short-term loans. Using this persona and promise, Panthaky successfully solicited over five million dollars in loans. "Lenders" would receive a promissory note prepared by Sine as Alpha's lawyer and signed by Panthaky. In fact, the money provided by these "lenders" funded no legitimate projects. Instead, some of the money went to repay earlier "lenders" so that the pyramid scheme could continue, and some ended up in the personal coffers of Panthaky and his cohorts.

To reassure the victims, Panthaky promised them that in case anything went wrong with Alpha's projects, they would be protected by assets held in the Alpha Funding Group Trust ("Alpha Trust"). Sine was the trustee of Alpha Trust. In that capacity, he prepared and signed security letters to victims explaining that he would liquidate the trust if Alpha defaulted on loans. Both Sine and Panthaky stated on numerous occasions, including in the security letters, that the trust held $54 million in Ginnie Mae securities.[2]

Almost always, the "lenders" were not repaid as promised and then experienced increasing difficultly in contacting Panthaky. Even after receiving complaints that the loans were not repaid on time, Sine continued to tell the victims that Alpha was a legitimate investment opportunity and had a track record of successful repayment of loans. When such excuses ran out and a "lender" continued to press for repayment, Sine would then play hardball — by, for example, insisting that the promissory note did not allow the "lender" to demand liquida-

---

[2]Ginnie Mae securities are pools of mortgages aggregated and guaranteed by the federally chartered Government National Mortgage Association ("Ginnie Mae") and resold to investors.

tion of the collateral or by instigating litigation against the "lender."

By 2000, under pressure from a growing number of unpaid victims, Sine purported to attempt as trustee of Alpha Trust to liquidate the collateral, only to find out — for the first time, he maintained — that the forms establishing the trust's ownership of the securities were worthless. That the forms were worthless was quite true: Such forms could only transfer ownership of securities issued in paper format, but the Ginnie Mae securities referenced by Alpha Trust's forms existed only in an electronic format. Moreover, Ginnie Mae had no record that Alpha Trust, Alpha, Sine, Panthaky, or the Delmarva Timber Trust ("Delmarva") — the entity the defendants claimed had transferred the securities to Alpha[3] — ever owned any of the securities referred to in the documents.

The main factual dispute at trial was whether Sine realized from the outset, rather than only after the victims demanded access to the collateral, that the supposed collateral was worthless. Sine testified during trial that he had a good faith belief that the trust legitimately owned the Ginnie Mae securities and made efforts to verify their ownership at the time the trust was established. One such effort, he represented, was a 1992 conversation with Jeffrey Franklin, a Maryland banker whose signature appears on the transfer forms. Sine also told the jury that when he learned in 2000 that the forms could not have transferred the securities, he entered into negotiations with Don Meddles, the current trustee of Delmarva, to obtain ownership of the securities. Sine ultimately filed several lawsuits in Utah, naming Meddles and Delmarva as defendants and supposedly seeking to recover the value of the securities.

---

[3]The defendants claimed that Delmarva had conveyed the securities to Alpha in 1991. The defendants never explained *why* Delmarva transferred securities worth $54 million to Alpha. Instead, they presented a Byzantine tale about the extraordinary wealth of Delmarva's owner, his clandestine career as a CIA agent, the secretive handling of his finances, and the disappearance of his supposedly huge assets after his death.

The government set out at trial to portray all these purported indices of good faith as just further steps in Sine's fraudulent scheme. Several witnesses — including Franklin — refuted Sine's story that he received assurances in 1992 that Alpha Trust did own the Ginnie Mae securities. The government presented evidence that Sine's efforts to liquidate the securities began only after several years of complaints by victims about Alpha's defaults and became most active after federal prosecutors began showing interest in the defendants' activities. And the government's witnesses highlighted Sine's inconsistent stories about these efforts.

As part of its effort to disprove Sine's good faith, the government decided — a decision that is at the core of this appeal — to highlight the shady nature of the legal tactics Sine used in trying to recover on behalf of Alpha Trust. Jurors heard testimony, for example, that Sine did not serve Meddles and Delmarva with the complaint in the Utah state court suit he filed against them in late 2000, so it was dismissed for a lack of prosecution. Also, Sine sued Meddles and Delmarva in Utah again in 2001, this time in both state and federal court, along with two entities, Polly & Co. and Hare & Co., that were the true owners of the Ginnie Mae securities referenced in the transfer forms. In response to this second suit, Meddles — in March 2003, over a year after the indictment in this case — settled the two suits for $18 million. But, according to the government's evidence, the settlement was a sham: Although Meddles said he was acting on behalf of Polly and Hare, the two entities were never served with the complaint, and were in fact subsidiaries of the Bank of New York, with no connection to Meddles. Sine nonetheless used his supposed status as a judgment creditor of the two entities to request that companies who owed money to Polly and Hare redirect repayments of those debts to him, as trustee of Alpha Trust. When these requests were in several instances successful, Sine, inexplicably, gave the money he received to Meddles — even though the settlement of the Utah case obligated Meddles to pay $18 million *to* Alpha Trust.

Eventually, the Bank of New York learned what was happening and took steps to stop the seizures of Polly's and Hare's assets. So Sine went to court again, this time filing a declaratory judgment action against the Bank of New York. That action was removed to the United States District Court for the Northern District of Ohio and assigned to Judge James Carr. In December 2003, Judge Carr entered a temporary restraining order against Sine to prevent his diversion of money owed to Polly and Hare. In March 2004, Judge Carr issued a preliminary injunction to the same effect and held Sine guilty of criminal contempt for violating the restraining order and continuing to redirect money from Polly and Hare.[4]

Well before the Ohio District Court proceedings, in February 2002, the government indicted Sine in the Eastern District of California for mail fraud, pursuant to 18 U.S.C. § 1341. A superseding indictment was filed in September 2004. That indictment alleged as the mail fraud a series of four letters sent in April and May 1999 between Clarence Trausch, a prospective "lender," and Renata Lee, an individual who was already a "lender" and whom the defendants had induced to seek out additional participants. In February 2005, a jury convicted Sine and his co-defendant Panthaky after one hour of deliberations. The judge sentenced Sine to seventy months in prison, which included an enhancement for lying during his trial testimony, and ordered him to pay $2.29 million in restitution. Sine timely appealed his conviction and sentence.

## II.

Sine's primary complaint on appeal is that the government repeatedly used factual findings contained in Judge Carr's March 2004 order during its cross-examination of Sine and

---

[4]The Sixth Circuit upheld the criminal contempt judgment in an unpublished disposition. *Sine v. Bank of N.Y.*, 174 F. App'x 930 (6th Cir.), *cert. denied*, 127 S. Ct. 592 (2006).

other defense witnesses, quoting large portions of the findings in doing so.[5]

In the Ohio case involving the Bank of New York, Judge Carr entered findings that, to put it mildly, were likely to lead the reader to distrust everything Sine said or did. For instance, one portion of Judge Carr's order states:

> When equity looks for a reason to favor Sine and Meddles it finds none. The record presently before the court is rife with chicanery, mendacity, deceit, and pretense. The versions each has given about his activities, whether in court or out, ring false.

> Sine purports to be a trustee — a *fiduciary* — acting on behalf of unidentified creditors. Yet he has taken none of the conventional steps to enforce the Utah judgment against Delmarva. He has not issued subpoenas duces tecum, demanded an accounting, or conducted a debtor's examination.

> It is not just what he has failed to do — it is what he has done that also compels a finding that Sine is not acting as a bona fide judgment creditor. Instead of keeping the funds coming to Meddles in the name of fake Polly and fake Hare, Sine *sends them on to Meddles*. When he does so, he has no idea what Meddles will do with them. He claims that he keeps the cash flowing in a one-way direction to keep Meddles "cooperative." This means, apparently, that

---

[5]We emphasize that nothing in this opinion is intended in any way as a criticism of Judge Carr or his order. The question before us is not whether Judge Carr's evaluation was a fair assessment of the evidence before him — which we have absolutely no basis to doubt. Rather, the issue is whether the government may shortcut its way to a criminal conviction by failing to put before the jury the same sort of evidence Judge Carr reviewed, while at the same time relying on the strong language of the Ohio order.

Sine expects Meddles will "cooperate" if encouraged to pump more cash from wells belonging to others. But there is no indication of when, if ever, payments on the Utah judgment will be made.

Indeed, the inference is fair, and can fairly be drawn, that no payments on that judgment ever will be made. There is no incentive to do so — why stop feeding a goose when it gives the promise of laying golden eggs forever? Once the judgment is satisfied, it cannot be a pretext for using fake Polly and fake Hare as putative judgment debtors to recover additional funds.

Sine holds in his hands a bottomless bucket, has done absolutely nothing to see that it gets filled, and is unlikely ever to do so.

In doing so, Sine appears to be breaching his duties as a trustee. In Utah, as elsewhere, a trustee's paramount duty is always to act for the best interest of the trust. To that end, "a trustee has a duty to use reasonable prudence and diligence in conserving and protecting all assets of the estate and to realize on claims in its favor if possible; and if he fails to do so he is subject to charge for any resulting loss."

I find, on the basis of the record presently before me, that Sine has failed to fulfill his fiduciary obligations to the judgment creditors he purports to represent. He has not acted with diligence or prudence to secure and protect the assets that he claims to be seeking. Indeed, his conduct has been entirely inconsistent with his obligations as trustee: even if his explanation for letting Meddles have funds were plausible, which it is not, he has not protected the creditors' interests by conditioning such receipt on performance of reciprocal, and, for the "trust," bene-

> ficial obligations by Meddles. While Sine may hold
> himself out as a trustee *de jure*, he is not functioning
> as one *de facto*.

*Sine v. Bank of N.Y.*, No. 3:03CV7662, slip op. at 17-18 (N.D.
Ohio Mar. 29, 2004) (quoting *Acott v. Tomlinson*, 337 P.2d
720, 725 (Utah 1959)) (citations omitted).

Although the full text of Judge Carr's order was not admit-
ted as evidence, the jury heard many of his findings. Explain-
ing that it did not want to surprise the court, the government
informed the court at the opening of the defense's case that
it believed the Ohio litigation would become relevant and that
it "intend[ed] to ask witnesses about [it]." Sine's lawyer
acknowledged the prosecutor's statement and voiced no
objection. And, as promised, the government asked more than
two hundred questions of various defense witnesses about
both the findings and the pervasively negative flavor of Judge
Carr's order, providing in the course of doing so a thorough
account of the order for the jury.

Many of these questions informed the jury about the sordid
details of Sine's litigation against Polly and Hare. For exam-
ple, during the cross-examination of Christopher Stappas, a
lawyer who testified on the defendants' behalf, the following
exchange took place between the prosecutor and the witness:

> Q.   Are you aware that the district judge in Toledo
>      had concluded or written that Sine and Meddles
>      stole the names of those partnerships, Polly and
>      Co and Hare and Co, from the Bank of New
>      York?
>
> A.   Yes.
>
> Q.   Are aware [sic] that the Court in Toldeo has
>      written that Sine and Meddles acquired and
>      sought to acquire securities registered in the

names of the real Polly and Co and the real Hare and Co?

A.   Yes, I'm aware of that.

Q.   Are you aware that the district judge in Toledo has written that Sine and Meddles diverted money that should have gone to the real Polly and Co and the real Hare and Co but instead went to Meddles?

A.   Yes, I'm aware of that.

Q.   Are you aware that the district judge in Toledo has written that the judgments that Sine and Meddles entered into in Utah were collusive?

A.   I was not aware of that.

Q.   That the judgments were fraudulent?

A.   I was not aware of that.

Q.   That they used these Utah judgments to give their efforts to take money from Polly and Co and Hare and Co to give it an air of legitimacy?

A.   I was not aware of that.

Q.   Are you aware that the district judge has written that Sine and Meddles, that the collusive judgments are not supported by any legitimate or legally cognizable claims?

A.   I recall reading that, I believe.

Q.   Are you aware that the district judge has written that Meddles stole the names Polly and Co and Hare and Co from the Bank of New York?

A.  I recall that.

Q.  Are you aware that the district judge has also written that Meddles and Sine have used the names to acquire without lawful authority assets held in the names of the real Polly and Co and the real Hare and Co?

A.  Yes, I'm aware of that.

Q.  Are you aware that the district judge has written that it appears that Meddles aided and abetted by Sine has been engaged in an effort to obtain assets belonging to the Bank of New York and other financial institutions through a series of fraudulent schemes?

A.  I recall that.

Q.  That the scheme is perpetrated with fraud and to have [sic] operated exclusively with fraudulent intent?

A.  I recall that.

Q.  Are you aware that the district judge in Toledo has concluded that Sine's claims of ignorance and confusion are not plausible?

A.  I don't recall that.

Q.  His conduct is rife with chicanery, mendacity, deceit and pretense?

A.  I don't recall that.

Q.  That's [sic] Sine is not acting as a bona fide judgment creditor?

A. I do recall that someplace.

. . . .

Q. And the district judge in Toldeo has concluded that Sine has failed to fulfill his fiduciary obligations; correct?

A. I believe so, yes.

Q. That Sine has not acted with diligence and prudence to secure and protect the assets that he claims to be seeking; correct?

A. Yes. I remember reading this. I can't remember word-for-word what was in that order.

Q. And that Sine has acted in the detriment of the judgment creditors by letting money flow through his hands and into the hands of his alleged adversary, Don Meddles; correct?

A. Yes.

Other questions asked by the government went beyond the details of Sine's conduct vis-a-vis Polly and Hare, and instead focused on Judge Carr's overall assessment of Sine. Such use of the order comes across most clearly in the closing set of questions the government asked Sine himself during cross-examination:

Q. The Court also said that you testified at a hearing on the order to show cause, did you not?

A. On the contempt charge I was able to testify limitedly.

Q.  And the Court concluded that your testimony was often inconsistent and thoroughly implausible; isn't that correct?

A.  That's what the Court said.

Q.  Now, you testified yesterday on direct that you do not lie?

A.  That's correct.

Q.  Is it not a fact, sir, that the Judge has written that your conduct is rife with chicanery; correct?

A.  I still don't lie. He said that, but I still don't lie.

Q.  Mendacity; that's what he wrote, right?

A.  That's what he did.

Q.  That's lying, isn't it?

A.  I don't know. I don't know what "mendacity" means. "Chicanery" is certainly doing something different than what you look like you're doing.

Q.  Your conduct was rife with deceit; correct?

A.  That's what he said.

Q.  And that your conduct was rife with pretense; correct?

A.  That's what he said.

Likewise, during its closing argument, the government juxtaposed Sine's criminal trial testimony with Judge Carr's evaluation of his testimony in the Ohio civil case:

> The judge also wrote that Sine's and Meddles is [sic] guilty of "chicanery and lying and deceit and pretense. It has been entirely inconsistent with his obligations as a trustee." Now, Sine's response to that when he was on the stand, basically all along is, "I haven't gotten a fair shake. I haven't gotten to testify for very long." Well, he testified for Judge Carr and it didn't take him long to conclude he was a liar.

Not only did the government place Judge Carr's findings before the jury in this fashion, but it stressed that *a judge* had already found those facts to be true in refuting Sine's efforts to disagree with Judge Carr's findings. Such use is apparent in the following portion of the cross-examination of Sine:

> Q. The District Judge who was hearing this case in Ohio is James Carr; correct?
>
> A. Correct.
>
> Q. He has written that what you and Meddles have done has been to create a scheme where you purloined or stole the name of partnerships owned by the Bank of New York; isn't that correct?
>
> A. That's what he said, but of course we don't agree with that.
>
> Q. The names that you stole were Polly and Company and Hare and Company; isn't that correct?
>
> A. We did not steal anything.

Q. That's what the judgment has concluded?

A. The Judge has said that based on the evidence he had and he says in his judgment that's based on what he had heard on the contempt charge.

. . . .

Q. The Court has also said that you diverted the flow of payments so that instead of going to the real Polly and the real Hare, they went to Don Meddles; correct?

A. Well, that's correct, but only after the security houses had been notified that we were a judgment creditor; that we were looking for assets of Owen Meddles, now deceased, and Don Meddles had taken over his area and that Delmarva Timber Trust was involved, and we requested to try to find out if these assets which we found by tracing backwards escheated funds.

In other words, from these particular accounts, funds had been escheated to the state of New York and other states. We traced it back to them, asked then if this belonged to them. They said what we needed to do was have Meddles file a change of address and change of officers and that they would then research it. If the research concluded he was the proper party, they would transfer it to him.

Q. My question was that the Judge has written that the scheme . . . . Is that correct?

A. Don Meddles signed the documentation. We allowed it to go through our address in Salt Lake City. We helped him fill out the forms.

The Court:    Answer the question. . . .

A.    That's correct.

The defense also referred to Judge Carr's order: During direct examination, Sine acknowledged that Judge Carr "wrote up some bad things about me" and found him in contempt.[6] After the government had asked Sine over one hundred questions about the order, he more extensively addressed the order during re-direct examination. Sine explained on re-direct that the judge had found him in contempt as a result of Sine having taken actions — actions he believed at the time were legitimate — to recover on behalf of the lenders, and that Judge Carr's order was preventing him from going forward with efforts to recover for the lenders. In his closing argument, Sine's lawyer used Judge Carr's statements to portray Sine as an unsung hero in the effort to recover the lenders' money:

> Judge Carr said some shocking things about Wesley Sine. There is no doubt about it. Well, why was Wesley Sine in Ohio? Why would you travel from Salt Lake City on [sic] Ohio to throw yourself in front of a judicial bus and take the kind of abuse that he has taken at the hands of Judge Carr. It can't be for fun. He was there trying to find and protect money that he believed belonged to Delmarva Timber Trust and could be used to pay the investors. . . .
>
> . . .
>
>     . . . [T]o this day, Wesley Sine and the small group of investors or lenders are the only people still trying to make good on Mr. Panthaky's loans. If by

---

[6]Sine also mentioned that a subsequent order filed by Judge Carr vacated parts of the original order. The government has never disputed the accuracy of that statement.

doing so, it makes you think better of him, we are glad for that. But what is driving him to put himself at risk before judges across the land is the interest of these borrowers or lenders, the people who are out their money, and in the end, it's clear a lot of people lost a lot of money, and Mr. Sine feels very sorry for those people, but he is not responsible for their losses. Wesley Sine, more than anyone, has remained steadfast in his resolve to try to help these people get their money. The government doesn't think he can do it. But Mr. Sine, even as we sit here, still believes he can.

During the course of Sine's cross-examination, his attorney successfully objected when the government asked to admit a copy of the order into evidence.[7] Sine's attorney nonetheless allowed the questions about the order to continue without objection. Because no objection was raised, we review the questioning concerning Judge Carr's order for plain error. *United States v. Tisor*, 96 F.3d 370, 376 (9th Cir. 1996); *see* FED. R. EVID. 103(d); FED. R. CRIM. P. 52(b). Ultimately, although we agree that the many references to Judge Carr's adverse findings and comments should not have been allowed, the plain error standard of review proves fatal to Sine's contention that the conviction should be reversed because of those references.

## III.

By presenting the thrust of Judge Carr's order to the jury through its cross-examination technique, the government used a tactic that had the potential unfairly to prejudice Sine. It also impermissibly placed hearsay evidence before the jury. Although many of the *facts* found in the order were quite rele-

---

[7]At the end of that day of testimony, the government renewed its motion to admit the order. The district court then agreed with Sine's argument that its admission would violate Rule 403.

vant to the issues before the jury, the government could not properly use the suggestive short cut that it did to bring those facts before the jury.

**[1]** We note preliminarily that although the order was never admitted into evidence, a line of questioning that repeatedly incorporates inadmissible evidence can be just as improper as the direct admission of such evidence. We agree with the Fourth Circuit that such "speaking" questions can violate the Federal Rules of Evidence. *See United States v. Hall*, 989 F.2d 711, 716-17 (4th Cir. 1993) (noting that by "proceed[-ing] to read the [inadmissible hearsay] statement to the jury under the guise of cross-examining . . . [t]he government's use of [the] unauthenticated statement violated Fed.R.Evid. Rule 802 . . . ."); *see also* FED. R. EVID. 103(c) ("In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as . . . asking questions in the hearing of the jury."); 21 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5042, at 954, 963 (2d ed. 2005) (noting that Rule 103(c) seeks to ensure the jury "goes into deliberations with their minds void of everything except evidence that has been properly validated by trial procedures" and that the rule should apply to leading questions to witnesses "that counsel should have known contained inadmissible evidence"); *cf. Douglas v. Alabama*, 380 U.S. 415, 419 (1965) (holding that "[a]lthough the Solicitor's reading of [the witness's] alleged statement, and [the witness's] refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that [the witness] in fact made the statement," and therefore was the basis for a Confrontation Clause violation).[8]

---

[8]We have previously held that incorporating inadmissible evidence into questioning can constitute prosecutorial misconduct. *See United States v. Sanchez*, 176 F.3d 1214, 1222 (9th Cir. 1999) (holding prosecutorial misconduct existed because "[i]t is improper under the guise of 'artful cross-examination,' to tell the jury the substance of inadmissible evidence" (quoting *Hall*, 989 F.2d at 716) (internal quotation marks omitted)). Sine, however, frames his challenge in evidentiary terms and does not raise a prosecutorial misconduct claim.

Here, the district court recognized that the government's strategy was little different in its impact from introducing the evidence when it observed — in response to the government's request to admit the entire order — that "it's been read into the record, much of it." In fact, the government premised its argument for admitting the order into evidence on the fact that "we have talked at great length about [the order], but it has come in in dribs and drabs," and reminded the jury during closing argument that "[w]e went through [the order] quite a bit during trial."

We have previously observed that "while prosecutors are not required to describe sinners as saints, they are required to establish the state of sin by admissible evidence unaided by aspersions that rest on inadmissible evidence, hunch, or spite." *United States v. Schindler*, 614 F.2d 227, 228 (9th Cir. 1980). That observation applies as readily to questioning that incorporates inadmissible evidence as it does to the direct introduction of such evidence. We therefore turn to the determination of whether the portions of Judge Carr's order read to the jury in the guise of cross-examination were properly admitted.

## A.

We begin by recounting why it was central to Sine's defense strategy to prove that the legal efforts to recover from Meddles, Polly, and Hare were legitimate. At the core of Sine's defense was the assertion that he held a good faith belief all along that Alpha Trust legitimately owned the Ginnie Mae securities, and therefore a good faith belief that the "lenders" would be repaid from those securities if not otherwise. Because he had such a good faith belief, Sine argued to the jury, he lacked the specific intent required for conviction under the mail fraud statute. *See United States v. Shipsey*, 363 F.3d 962, 967 (9th Cir. 2004) (noting a good faith defense is covered by jury instructions specifying that mail fraud requires specific intent). To demonstrate his good faith to the

jury, Sine presented evidence of the steps he had taken to verify Alpha Trust's legitimate ownership of the collateral and to recover the value of the Ginnie Mae securities once he discovered that the transfer documents were worthless. A critical piece of this lack-of-fraudulent-intent evidence was the litigation Sine instituted, namely the lawsuits involving Meddles, Polly, and Hare.

**[2]** Given this defense, the government was entitled, to the extent consistent with the Federal Rules of Evidence, to introduce evidence calculated to prove the litigation efforts a sham. *See* FED. R. EVID. 402 ("All relevant evidence is admissible, except as otherwise provided . . . by these rules . . . ."). Facts that raised doubts as to whether Sine had a realistic legal basis for expecting a successful result when he brought suit would satisfy this relevance standard, as such facts would support the inference that the litigation was not filed with a good faith belief of recovery. The *facts* reviewed in Judge Carr's order, particularly the facts indicating that Sine failed to fulfill his fiduciary obligations as trustee of Alpha Trust, were therefore relevant evidence.[9] In addition, the adverse *result* in the Ohio district court litigation was itself pertinent to the jury's consideration of the good faith defense, because

---

[9]Judge Carr's findings did not collaterally estop Sine from arguing that the litigation against Polly and Hare proceeded in good faith and fulfilled his fiduciary responsibilities. Judge Carr made the bulk of his findings in the course of granting a preliminary injunction in a civil suit that prevented Sine from seizing Polly's and Hare's assets. Because these findings were made in a preliminary proceeding and pursuant to the burden of proof in civil cases, they cannot prevent Sine from relitigating the same issues in his criminal trial. *See Dias v. Elique*, 436 F.3d 1125, 1129 (9th Cir. 2006); *Starbuck v. City & County of S.F.*, 556 F.2d 450, 457 n.13 (9th Cir. 1977). The government therefore could not justify its use of Judge Carr's findings as an offensive use of collateral estoppel. Although Judge Carr's order also made some findings in the course of holding Sine guilty of criminal contempt, the government did not limit its references to those criminal contempt findings, which addressed only the narrow issue of whether Sine wrongly retained particular funds belonging to Polly after a temporary restraining order had been granted.

a successful suit would support the notion that the litigation efforts were good faith attempts to recover funds for the "lenders," while an unsuccessful suit might not. Our determination that these facts were relevant, however, does not resolve whether the government could introduce them by reading portions of Judge Carr's order. We now turn to that question.

## B.

Sine argues that bringing the adverse, derogatory factual findings and comments in Judge Carr's opinion before the jury created too great of a danger of unfair prejudice and thus violated Rule 403 of the Federal Rules of Evidence. We agree.

[3] Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." FED. R. EVID. 403. We have previously observed that factual testimony from a judge unduly can affect a jury. *See Chein v. Shumsky*, 373 F.3d 978, 989 n.6 (9th Cir. 2004) (en banc).[10] Similarly, jurors are likely to defer to findings and determinations relevant to credibility made by an authoritative, professional factfinder rather than determine those issues for themselves. *Cf.* FED. R. EVID. 605

---

[10]In *Chein*, we held that no rational juror could have found that the record evidence proved that the defendant lied about a material matter, as required by California's perjury statute. In discussing why the jury nonetheless returned a guilty verdict, thereby violating the defendant's due process rights, we highlighted testimony by a superior court judge, who served as an " 'expert' on materiality" and told the jury how the defendant's statement, in his view, would have been material. *Chein*, 373 F.3d at 989. We stated that "the likely impact on the jury of a sitting state court judge pronouncing the existence of an essential element of a crime, while vigorously denouncing the defendant and his credentials, is difficult to ignore. . . . [W]e note that this highly unusual testimony at least explains why the jury returned a guilty verdict on sparse, constitutionally insufficient evidence." *Id.* at 989 n.6.

("The judge presiding at the trial may not testify in that trial as a witness."); *United States v. Frakenthal*, 582 F.2d 1102, 1108 (7th Cir. 1978) ("[T]he possibility that prestige, dignity, and authority may have somehow been imparted to the prosecution's case by the judge's appearance on its behalf cannot lightly be dismissed.").

**[4]** Although we have not previously addressed the question, other federal circuit courts have held that the use as evidence of facts as found in a judicial opinion can unfairly prejudice a party. Of particular relevance is the Fourth Circuit's review of a civil trial in which "[p]ortions of the findings of fact" from a previous civil lawsuit between the same parties "were read to the jury by plaintiffs' counsel during the direct examination of [a plaintiff]. The portions of [the judge's] order that plaintiffs' counsel read to the jury repeatedly referred to factual findings of misrepresentations made by [the defendant], [his] failure to disclose material information, and [his] participation in a civil conspiracy, as well as findings that [his wife] had knowingly filed false affidavits in the case." *Nipper v. Snipes*, 7 F.3d 415, 416 (4th Cir. 1993). The Fourth Circuit held the admission of these findings over the defendant's objection erroneous and reversed the jury's verdict based on the prejudice produced by the evidence. *Id.* at 418.

**[5]** As one of its grounds for reversal, the Fourth Circuit held that "[i]n circumstances similar to those in this case such evidence should be excluded under [Rule] 403. This is because judicial findings of fact 'present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.' " *Id*. (quoting *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1186 (E.D. Pa. 1980)). The Eleventh Circuit has ruled similarly. *See U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1287-88 (11th Cir. 2001) ("The district court abused its discretion [under Rule 403] in admitting Judge Garrett's opinion. The jury, not Judge

Garrett, was charged with making factual findings on Appellees' allegations in this case.").

**[6]** Our determination that reference to facts found in a judicial opinion can unfairly prejudice a party does not mean that admission of such facts will *always* fail the balancing test of Rule 403. Such a holding would be inconsistent with courts' "increasing reluctance to reject *in toto* the validity of the law's factfinding processes outside the confines of res judicata and collateral estoppel," which was noted, with approval, by the drafters of the Federal Rules of Evidence. FED. R. EVID. 803(22) advisory committee nt. (1972); *see also* Hiroshi Motomura, *Using Judgments as Evidence*, 70 MINN. L. REV. 979, 1038 (1986) ("[M]ost modern commentators would not categorically declare juries incompetent to weigh prior [judicial] determinations."). *But cf.* 2 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 298, at 337 (6th ed. 2006) ("Admitting civil judgments rendered against the defendant directly raises constitutional issues . . . ."). In this case, however, the nature of the facts found and comments made by Judge Carr — directly opining on Sine's motivations and truthfulness, thereby implicating Sine's overall credibility as a witness — heavily weighs on the unfair prejudice side of the balance. *Cf.* FED. R. EVID. 701 (limiting the use of opinion testimony by lay witnesses); *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985) (holding that expert witness testimony was impermissible when it "in effect . . . impermissibly . . . asked [the jury] to accept an expert's determination that these particular witnesses were truthful" because "[i]t is the jurors' responsibility to determine credibility by assessing the witnesses and witness testimony in light of their own experience"), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) (en banc).

Supporting the conclusion that the use of Judge Carr's opinion was violative of Rule 403 as tending to prejudice the jury is the consideration that the government could have proved the facts in Judge Carr's findings through less prejudi-

cial means. The Supreme Court has held that "what counts as the Rule 403 'probative value' of an item of evidence . . . may be calculated by comparing evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 184 (1997); *see also id.* at 182-83 ("If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk."). As far as appears, the evidence that the Bank of New York presented to Judge Carr, which underlay his findings, was available to the government at the time of the criminal trial.

The government argues that requiring it to present alternate evidence about such facts would have created practical difficulties in tracking down witnesses and exhibits for an issue that only arose during the course of trial because of Sine's choice of defense strategy. A party cannot, however, avoid the dictates of the rules of evidence simply because they create a burden. Whether, as the government maintains, testimony about the facts underlying Judge Carr's order "would have been a terrible waste of time over a tangential issue of no moment" is not a pertinent consideration if, as here, the more efficient mode of proof was also considerably more likely to sway the jury against the defendant than the more traditional means.

Further, the suggestion that the Ohio federal court litigation concerned "a tangential issue of no moment" to this case bolsters our holding that the extensive recitation of Judge Carr's extremely critical findings violated Rule 403. Effectively, the government's argument is that the underlying facts concerning the Ohio suit were of little probative value, and that it was, instead, the resoundingly negative assessment of Sine's overall credibility contained in Judge Carr's opinion that the government wanted the jury to hear. We are unwilling to condone such a prejudicial shortcut.

## C.

We also agree with Sine that some of the government's references to Judge Carr's order constituted the impermissible use of hearsay evidence. Under the Federal Rules of Evidence, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" is not admissible absent an applicable exception. FED. R. EVID. 801, 802.[11]

[7] A court judgment is hearsay "to the extent that it is offered to prove the truth of the matters asserted in the judgment." *United States v. Boulware*, 384 F.3d 794, 806 (9th Cir. 2004), *cert. denied* 126 S. Ct. 337 (2005); *see also* 2 MCCORMICK ON EVIDENCE, *supra*, § 298, at 337 (noting the historic treatment of prior judgments as hearsay). It is even more plain that the introduction of discrete judicial factfindings and analysis underlying the judgment to prove the truth of those findings and that analysis constitutes the use of hearsay. The concern about evidence that is neither based on personal knowledge nor subject to cross-examination, which explains an ultimate judgment's treatment as hearsay, *see* Motomura, *supra*, at 980 n.4, is even more pronounced when dealing with statements that recapitulate in detail others' testimony and declarations. We therefore agree with the Fourth, Tenth, and Eleventh Circuits that judicial findings of facts are hearsay, inadmissible to prove the truth of the findings unless a spe-

---

[11]We reject, however, Sine's terse claim that the use of this hearsay violated the Confrontation Clause. Only testimonial out-of-court statements raise Confrontation Clause concerns. *Whorton v. Bockting*, 127 S. Ct. 1173, 1183 (2007) (citing *Crawford v. Washington*, 541 U.S. 36 (2004)). Although he cites *Crawford* in passing, Sine does not argue that Judge Carr's statements were testimony, with good reason: There is no reason to believe that Judge Carr wrote the order in anticipation of Sine's prosecution for fraud, so his order was not testimonial. *See United States v. Ballesteros-Selinger*, 454 F.3d 973, 974-75 (9th Cir. 2006) (holding that an immigration judge's deportation order was nontestimonial because it "was not made in anticipation of future litigation").

cific hearsay exception exists. *Herrick v. Garvey*, 298 F.3d 1184, 1191-92 (10th Cir. 2002); *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994); *Nipper*, 7 F.3d at 417.

[8] By peppering Sine during cross-examination with questions referring to the fact that *a judge* had found that Sine stole the identity of Polly and Hare, failed to act as an appropriate fiduciary, and acted with mendacity, the government used the order to establish the truth of Judge Carr's findings.[12] The government wanted the jury to agree with Judge Carr's conclusions that Sine was not acting as a good faith fiduciary in conducting the Ohio litigation.[13] So, unless the order comes within a hearsay exception recognized by the Federal Rules of Evidence, the references to the order should not have been allowed.

[9] The government does not argue that any such exceptions apply here, and we hold that none is available.[14] Two

---

[12]The government argues that its purpose in asking defense witnesses about the order was not to establish the truth of the findings in the order. Rather, posits the government, the reason for cross-examining witnesses with the order was to establish that they were not fully informed about Sine's efforts and were therefore less credible. This rationale does not, however, explain the questioning of Sine himself. We therefore need not and do not decide whether the government's non-hearsay rationale stands up with regard to the other witnesses.

[13]Even as part of Sine's cross-examination, the government could have referred to Judge Carr's order in more limited ways that would not have constituted the use of hearsay. Because "a prior judgment is not hearsay . . . to the extent that it is offered as legally operative verbal conduct that determined the rights and duties of the parties," *Boulware*, 384 F.3d at 806, the government could have asked Sine about the fact that Judge Carr's order denied recovery against Polly and Hare. The denial of recovery would have helped to prove that Sine's efforts were illusory and thus not in good faith.

[14]Sine concedes that the Federal Rules of Evidence's provision on impeaching a witness based on his commission of a prior crime involving dishonesty or false statements allowed the government to ask about Judge Carr's determination that he had committed criminal contempt. *See* FED.

hearsay exceptions in the Federal Rules of Evidence explicitly allow for the admission of judgments. Those exceptions, however, are limited to (1) prior judgments involving criminal convictions subject to more than one year of imprisonment, FED. R. EVID. 803(22), and (2) judgments used to provide "proof of matters of personal, family or general history, or boundaries," *id.* 803(23). This case does not involve a judgment covered by those limited exceptions.[15] And although the Rule's public records hearsay exception allows "factual findings" resulting from "investigations" conducted by "public offices and agencies," that exception does not apply against criminal defendants. *Id.* 803(8).[16]

## D.

The government argues that Sine's defense strategy "opened the door" to the questioning about Judge Carr's order even if it was otherwise inadmissible. We disagree.

**[10]** As we have already recognized, Sine's arguments about his good faith efforts to recover money for the Ginnie Mae securities made Judge Carr's order relevant to the case.

R. EVID. 609(a)(2). Assuming Rule 609 applies to a criminal contempt conviction — which we do not decide — "[a]bsent exceptional circumstances, evidence of a prior conviction admitted for impeachment purposes may not include collateral details and circumstances attendant upon the conviction." *United States v. Rubio*, 727 F.2d 786, 797 n.5 (9th Cir. 1983). The findings presented by the government went far beyond the mere fact that Judge Carr has found Sine guilty of criminal contempt.

[15]It is not apparent whether those exceptions cover judicial factfinding that accompanies the judgment or just the judgment itself. Because the exceptions do not apply to this case in any event, we express no opinion on that question.

[16]Even in civil cases, where the exception does apply, several other circuits have held that it covers only factual findings by executive branch agencies and officials, not judicial factfinding. *Herrick*, 298 F.3d at 1192; *Jones*, 29 F.3d at 1554; *Nipper*, 7 F.3d at 417.

The government's use of the opened door principle is therefore correct to that extent.

**[11]** But the "opening the door" doctrine is not so capacious as to allow the admission of *any* evidence made relevant by the opposing party's strategy, without regard to the Federal Rules of Evidence.[17] As we have explained, the "opening the door" principle allows parties "to introduce evidence on the same issue to rebut any *false* impression that might have resulted from the earlier admission." *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988) (emphasis added); *see also United States v. Brown*, 921 F.2d 1304, 1307-08 (D.C. Cir. 1990) ("Although the government may prevent a defendant from using rules of evidence to select and enter pieces of evidence wholly out of context, the government may not shore up a prosecution by pushing through the open door evidence not necessary to remove any unfair prejudice created by defense counsel's tactics." (internal quotation marks omitted)).

**[12]** Sine, in his direct testimony, made only passing reference to the opinion, *accurately* stating that Judge Carr "wrote up some bad things about me." The limited testimony was insufficient to open the door to the government's otherwise impermissible references to the order, as Sine did not introduce an inaccurate portrait of the order itself. Sine's limited and accurate reference to Judge Carr's opinion did not create an appeal to the professional authority of the judge that could have been countered by the government's use of the order.

---

[17]The Federal Rules of Evidence's "principle of completeness" also does not allow the admission of otherwise inadmissible statements. *See United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) ("Because [the witness's] out-of-court statements . . . do not fall within an exception to the hearsay rule, they are inadmissible, regardless of Rule 106."); *see also* FED. R. EVID. 106 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction . . . of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.").

The government does not maintain otherwise, but argues more broadly that "[t]he picture Sine painted . . . of selflessness and hope, that he was on the verge of making substantial repayments to the victims" opened the door. Presenting a theory of the case that can be effectively rebutted by otherwise-inadmissible evidence, however, does not by itself open the door to using such evidence; only partial, misleading use of the evidence itself can do so.

**[13]** Our determination that Sine did not open the door to the government's use of Judge Carr's order accords with our previous holding that a party cannot appeal to the truth of the matter asserted by hearsay evidence even when its opponent has opened the door to the use of otherwise inadmissable hearsay. *United States v. Collicott*, 92 F.3d 973, 981 n.8, 982 & n.11 (9th Cir. 1996). Instead, the adversary is limited to using the hearsay evidence for matters not concerning the truth of the statement, such as explaining or minimizing a witness's testimony represented to be inconsistent with a prior statement. *Id*. at 980-81. In this case, the government's use of Judge Carr's findings was not so limited. At least in part, the government referred to the order to assert that the truth of its conclusions — that the facts asserted in the litigation were not true, and that Sine did not believe they were — thereby undermining Sine's contrary representations.[18] The government's use of Judge Carr's order thus went well beyond the bounds of the opened door principle.

## IV.

**[14]** Our holding that the government erred in its use of the order, and that the use was to some degree prejudicial to Sine, cannot resolve this appeal. Despite its pervasiveness, Sine never objected during trial to questioning premised on Judge Carr's order, or to the prosecutor's use of the order during

---

[18]No limiting instructions were given to the jury about the purposes for which it could consider Judge Carr's order.

closing argument. So, applying the plain error standard, we may reverse only if the error is " 'plain' and . . . 'affect[s] substantial rights.' Moreover, [plain error review] leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (first and third alterations in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)) (internal quotation marks omitted); *see also Tisor*, 96 F.3d at 376-77 (applying *Olano* to plain error review under Rule 103(d) of the Federal Rules of Evidence).

**[15]** Under the plain error review standard applicable to the errors in this case, an individual's substantial rights are not affected unless he can show that the error may well have affected the outcome of the trial. *Olano*, 507 U.S. at 734; *see also United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (holding that a defendant must show "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different" (alteration in original) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)) (internal quotation marks omitted)); *United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc) (holding a defendant "must establish 'that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding' " (quoting *Dominguez Benitez*, 542 U.S. at 83)).

Our plain error analysis in this case must reflect the two ways that Judge Carr's order could have affected the jury: It could have caused jurors to reject Sine's specific factual assertions about his litigation activities, based on Judge Carr's contrary findings about Sine's course of conduct. And it could have caused them generally to disbelieve Sine as a witness, based on Judge Carr's firmly negative findings about Sine's credibility — such as the determination that he had displayed "chicanery, mendacity, deceit, and pretense."

**[16]** As to the first potential effect, we readily find that plain error review does not dictate reversal. Given the overwhelming evidence presented to the jury in this case refuting Sine's good faith defense, Sine cannot show a "reasonable probability" that a trial conducted without the references to Judge Carr's order would have resulted in a different outcome. Even without the judicial findings refuting Sine's evidence that the litigation involving Meddles and the Bank of New York proved his good faith, the jury heard extensive evidence inconsistent with Sine believing that the scheme was legitimate and that the loans were actually secured by Ginnie Mae securities.[19] That evidence included: denials that various individuals had assured Sine about Alpha Trust's legitimate ownership of the securities; a 1998 meeting during which Sine offered excuses for his inability to physically produce the securities; exotic stories he told to excuse Panthaky's failure to pay; Sine's repeated lies about Alpha's supposedly rosy record of repayment; suits that Sine filed against several individuals who pressed Alpha for repayment; and the quick realization of several financial professionals that the collateral was not legitimate when they conducted due diligence on Alpha. Taken together, all of this evidence thoroughly undermined Sine's use of the Utah and Ohio litigation to prove his good faith belief in his representations to "lenders."

---

[19]In addition to Judge Carr's order, Sine complains about the introduction of other inadmissible evidence: A trial pleading filed by the government in the Utah federal district court suit against Polly and Hare; a Fifth Circuit opinion referencing a fraudulent scheme involving an entity called Delmarva; deposition testimony by Panthaky; a consent decree signed by Meddles; and testimony from several victims about the impact of the fraud. Each of those items received only cursory reference during the trial and the defense raised no contemporaneous objection to their introduction. Even assuming the evidence was inadmissible, our evaluation of the overwhelming nature of the admissible evidence of Sine's lack of good faith does not change. Our holding that referencing Judge Carr's order did not affect the outcome of the trial extends to the use of the other challenged evidence. We therefore do not resolve whether those pieces of evidence were properly admitted.

**[17]** So, entirely leaving out Judge Carr's findings about Sine's tactics, Sine's use of the litigation involving Meddles and the Bank of New York to demonstrate his good faith was doomed to failure. No jury could have believed that Sine really thought that filing those suits demonstrated he was acting as trustee for a legitimate financing operation that owned legitimate securities. Judge Damrell, who had heard first-hand all the trial testimony, so concluded in denying Sine's post-trial motion for a new trial:

> [Y]ou have substantial overwhelming evidence, in my view, of fraud committed by both defendants. . . . It's my assessment, that this jury, long before Judge Carr's name is mentioned in this courtroom could reasonably conclude, and I think did reasonably conclude, that there were two fraudsters on trial who bilked people of millions of dollars. One as an instrumentality using his law degree and legal profession and his role as trustee.
>
> The evidence was absolutely overwhelming before we get to the issue of this lawsuit filed in Utah or Ohio.

We agree with this assessment of the evidence.

As to the second potential effect of the order — its potential to substitute Judge Carr's evaluation of Sine's credibility for the jury's ultimate role to decide credibility — we are much more troubled. The order's use of terms like "chicanery, mendacity, deceit, and pretense" are highly pejorative, however accurately they may have described Sine's behavior. The impact of this strongly negative assessment was bolstered by the prosecutor's juxtaposition, during Sine's cross-examination and during closing argument, of Judge Carr's unflattering conclusions with Sine's claims that he was now telling the truth. The jury's evaluation of Sine's entire testimony could well have been influenced by knowing that a

*judge* — who would be presumed to have expertise in judging credibility — had already deemed him untrustworthy. *See Chein*, 373 F.3d at 989 n.6 ("[T]he likely impact on the jury of a sitting state court judge pronouncing the existence of an essential element of a crime, *while vigorously denouncing the defendant and his credentials*, is difficult to ignore." (emphasis added)). The jury has the ultimate task of making credibility determinations about individual witnesses; those evaluations may be prejudiced when the jury is in effect asked to rely on a third party's expertise instead. *See Binder*, 769 F.2d at 602 (holding testimony that "in effect . . . impermissibly . . . asked [the jury] to accept an expert's determination that these particular witnesses were truthful" was erroneous because "[i]t is the jurors' responsibility to determine credibility by assessing the witnesses and witness testimony in light of their own experience," and finding this error was prejudicial when the credibility of the particular witnesses was crucial to the case).

In this case, however, we cannot find that Sine has demonstrated a "reasonable probability" that the jury's verdict would have been altered had the references to Judge Carr's findings not made it harder than it already was for the jury to view Sine as a credible witness. For, even without the order, it was already extremely unlikely that the jury would have viewed Sine as credible. Sine's testimony was contradicted by the testimony of several other witnesses and simply defied common sense.

For example, several financial professionals testified that they confronted Sine about the sham he was perpetrating. Yet, despite these clear warnings from knowledgeable individuals, Sine made no effort to confirm that Alpha Trust legitimately owned the securities but instead continued to promote the scheme. Had Sine genuinely been acting as a conscientious but naive trustee, the warnings certainly would have given him pause, causing him to take steps to confirm the validity, or even the existence, of the securities. But Sine took no such

steps. Likewise, Sine admitted he did not retain copies of the letters he claimed to have written to confirm the legitimacy of the securities' transfer nor documented the conversations with third-parties who he claimed confirmed Alpha Trust's ownership. Given the critical importance of such confirmations for his task as trustee, these failure are inexplicable.

Again, we find Judge Damrell's observations instructive to our prejudice inquiry. In denying the motion for a new trial, Judge Damrell noted that "Mr. Sine's credibility was in tatters by the time this evidence [from Judge Carr] came in." He commented at length about the "[u]tterly incredible" and "[s]imply incredible" nature of Sine's testimony. Judge Damrell particularly highlighted Sine's claims that some of the transactions merely involved "refinancing" rather than a Ponzi scheme — a claim so preposterous that "[t]he temperature in this courtroom dropped 20 degrees" when it was made. Ultimately, Judge Damrell concluded that "the defendant's testimony in this [case] was was [sic] the most powerful evidence of his guilt."[20]

**[18]** Our independent review of the record supports the findings about Sine's complete lack of credibility from the judge who was the first-hand witness to his testimony. Sine has therefore failed to establish a "reasonable probability" that the jury would have acquitted him absent the references to Judge Carr's findings. *Cf. United States v. Geston*, 299 F.3d 1130, 1136-37 (9th Cir. 2002) (holding that impermissible questioning that attacked a defense witness's credibility constituted reversible plain error when the defendant's "fate hinged on resolution of the conflicting testimony presented by the parties" and noting "[w]e may consider the relative strength of the parties' positions in deciding whether reversal is appropriate"); *United States v. Brooke*, 4 F.3d 1480, 1488

---

[20]During Sine's sentencing hearing, Judge Damrell again noted the perjurious nature of his testimony and accordingly applied an obstruction-of-justice enhancement to the Sentencing Guidelines calculations.

(9th Cir. 1993) (refusing to find the trial court's erroneous admission of evidence that impugned a defendant's credibility was harmless when "the trial centered around the conflicting testimony" of the defendant and a government witness and the erroneous evidence "in all likelihood affected the jury's determination of which of the two antagonists to believe"); *United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir. 1993) (holding that reversing based on plain error partly depends on the "closeness of the case" when a prosecutor vouches for the truthfulness of a government witness).[21]

## V.

**[19]** The government's decision to inform the jury that a judge had made factual findings inconsistent with the defendant's theory of the case ran far too great a risk of unfairly prejudicing the defendant, and allowed the government to shortcut the usual process of proving facts by putting witnesses before a jury. In this case, however, the defendant completely failed to object to the government's repeated impermissible references to the judge's order. Because the trial judge's failure *sua sponte* to prevent such references did not affect Sine's substantial rights in a case where other evidence overwhelmingly proved the defendant's guilt, Sine's conviction must stand.

**AFFIRMED.**

---

[21]Because we hold that the errors in this trial did not affect Sine's substantial rights, we need not decide whether they were "plain." We do note that although there is no Supreme Court case law or case law in this circuit *precisely* on point, *Chein* points in the direction of our evidentiary holdings, and the pertinent case law in other circuits all supports Sine's arguments. These circumstances suggest that the error was in fact plain. *See United States v. Shwayder*, 312 F.3d 1109, 1121 (9th Cir. 2002).