**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kenneth FOSTER, Defendant–
Appellant.**

**No. 99–50503.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 5, 2000

Filed Sept. 13, 2000

Mayra Garcia, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant–appellant.

George D. Hardy, Assistant United States Attorney, Criminal Division, San Diego, California, for the plaintiff–appellee.

Before: THOMPSON, W. FLETCHER and FISHER, Circuit Judges.

FISHER, Circuit Judge:

Kenneth Foster appeals his conviction and sentence for importing marijuana and possessing marijuana with intent to distribute. On appeal, Foster challenges, among other things, the government's impeachment of his testimony based on a prior conviction for receipt of stolen property and the admission of certain of his post-arrest statements at trial.

The district court had original jurisdiction over the federal offenses charged against Foster, see 18 U.S.C. § 3231, and we have jurisdiction to review Foster's conviction under 28 U.S.C. § 1291. We hold that the district court erred in admitting certain impeachment evidence, and we therefore reverse Foster's conviction.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

On January 15, 1998, Kenneth Foster drove a grey Mazda 626 into the United States at the Otay Mesa port of entry. Unfortunately for Mr. Foster, customs agents stopped the Mazda as part of a "block blitz," which is a detailed inspection of a group of vehicles randomly selected and diverted en masse from the preliminary inspection site. During the block blitz, a narcotics detector dog alerted to Foster's Mazda, so inspectors asked Foster to get out of the car.

Customs agents escorted Foster to a security office and, after patting him down, asked him questions regarding his name, address, date of birth, height and weight. Foster, who did not have any identification, gave the agents false information, including the name "Ken Anderson" and an incorrect home address and birth date. William Tyson, a plain-clothes customs inspector, could not locate background information on a "Ken Anderson" with the birth date given by Foster, so he asked Foster again for his name and other personal information. Foster then revealed his true name and correct date of birth.

In the meantime, on closer inspection of the Mazda (which smelled strongly of fabric softener), the agents located 26 packages of marijuana hidden in the vehicle's natural compartments. The total weight of the marijuana was 68.28 pounds.

Based on this information, Tyson placed Foster under arrest and informed him of

---

1. On appeal, Foster also challenges the denial of his request for a continuance and the sufficiency of the evidence considered by the district court in sentencing Foster as a career offender. Based on our holding, it is not necessary for us to reach either claim.

his *Miranda* rights. Foster immediately invoked his right to counsel. Nevertheless, Tyson continued to question Foster in order to obtain "additional biographical information" from him. Asked a second time for his address, Foster informed Tyson that he had been homeless and living in Mexico for an extended period. Foster also told Tyson that he was a traveling musician. Tyson then drove Foster to a different port of entry for detention. During the 10–minute trip and again at the second port of entry, Tyson and Foster engaged in conversation. As discussed in greater detail below, Foster made several incriminating statements during his conversations with Tyson.

Foster was indicted on two counts: (1) knowing and intentional importation of marijuana, in violation of 21 U.S.C. §§ 952 and 960, and (2) knowing and intentional possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Prior to trial, Foster sought to exclude the statements he had made to Tyson, arguing that they were involuntary and the product of improper interrogation. Foster also objected to the government's motion to introduce (for impeachment purposes) his 1991 misdemeanor conviction for receiving stolen property, asserting that receiving stolen property is not a crime of dishonesty. The district court rejected both pre-trial requests.

A jury convicted Foster on both counts. The district court sentenced Foster to 60 months of imprisonment on each count, to be served concurrently. We accepted Foster's notice of appeal as timely, holding that by reason of excusable neglect he was entitled to an extension of time within which to file the notice. *See United States v. Foster,* No. 98–50542, 1999 WL 311251 (9th Cir. May 14, 1999). This appeal followed.

## DISCUSSION

I. *Impeachment of Foster's Testimony at Trial*

■ Federal Rule of Evidence 609 provides that, for the purpose of impeaching a witness, "evidence that [the] witness has been convicted of a crime shall be admitted if [the crime] involved dishonesty or false statement, regardless of the punishment." Fed.R.Evid. 609(a)(2). We review the district court's interpretation of Rule 609 *de novo. See Dean v. Trans World Airlines, Inc.,* 924 F.2d 805, 811 (9th Cir.1991).

■ In 1991, Foster was convicted of receiving stolen property, a misdemeanor under California law. Prior to trial, Foster argued that this conviction was not admissible under Rule 609(a)(2) because receipt of stolen property does not constitute a crime of dishonesty. The district court rejected Foster's argument.

During its cross-examination of Foster, the government used the 1991 conviction to attack Foster's credibility. At one point, the government asked, "Isn't it true that the reason why you gave the name, Ken Anderson, instead of Ken Foster [was] because you have a criminal record under the name of Ken Foster?" The district court sustained Foster's objection to this question and struck the question from the record. At a later point, the government asked, "Do you have any experience with law enforcement?" The district court again sustained Foster's objection. Finally, the government managed to get the prior conviction into the record by asking, "Are you the same Kenneth Foster that was convicted of receiving stolen property in 1991?" Foster objected again, but the district court overruled the objection. The government also attempted to discuss the previous crime with Foster by asking whether it was a stolen car he had received, but the district court stopped the line of questioning and ruled that the government could not "go into that any further."

As he did before the district court, Foster argues that receipt of stolen property should not always be considered a crime of dishonesty for purposes of Rule 609(a)(2) and that the district court erred in admitting evidence of his prior conviction without further inquiry into the facts underly-

ing .his 1991 conviction. In light of our prior cases interpreting Rule 609(a)(2), we agree with Foster's interpretation of the rule and conclude that the district court erred in admitting the 1991 conviction.

In *United States v. Ortega*, 561 F.2d 803 (9th Cir.1977), we held that shoplifting (a misdemeanor) is not a crime of dishonesty under Rule 609(a)(2). We reasoned that it was the "intent of the draftsmen of Rule 609 [to limit] the 'dishonesty and false statement' language to those crimes that involve some element of misrepresentation or other indicium of a propensity to lie and [to exclude] those crimes which, bad though they are, do not carry with them a tinge of falsification," and therefore concluded that "[a]n absence of respect for the property of others is an undesirable character trait, but it is not an indicium of a propensity toward testimonial dishonesty." *Id.* at 806.

Since *Ortega*, we have applied this interpretation of Rule 609(a)(2) to other property crimes. *See, e.g., United States v. Glenn*, 667 F.2d 1269, 1273 (9th Cir.1982) (holding that burglary and grand theft are not per se crimes of dishonesty). In 1992, an en banc panel of this court reaffirmed that "[t]he legislative history of Rule 609 makes clear that Congress used the term 'dishonesty' in [a] narrow[ ] sense, to mean only those crimes which involve deceit." *United States v. Brackeen*, 969 F.2d 827, 830 (9th Cir.1992) (en banc) (per curiam) (bank robbery not per se crime of dishonesty).

■ With these cases in mind, particularly given the reasoning employed in *Ortega* and *Brackeen*, we conclude that receipt of stolen property may not automatically be considered a crime of dishonesty for purposes of Rule 609(a)(2). Shoplifting, burglary, grand theft and bank robbery are all affirmative acts taken by defendants, requiring an intention to deprive one or more persons of their rightful property. Such crimes are not always "deceitful," but they are much more likely to be so than is the crime of receipt of stolen property. *Cf. United States v. Field*, 625 F.2d 862, 872 (9th Cir.1980) ("[T]he crime of receiving stolen property suggests a lack of veracity on the part of [the defendant], though not so clearly as do those crimes falling within rule 609(a)(2)."). Even if one knowingly receives stolen property, that transaction is not the original act that deprived the rightful owner of his or her property and, in many cases, it can be accomplished without any misrepresentation or deceit on the part of either the giver or the receiver. We therefore hold that receipt of stolen property is not per se a crime of dishonesty for purposes of Rule 609(a)(2), and conclude that the district court erred in treating it as such.[2] Because we also conclude that the effect of this error was not harmless, we reverse Foster's conviction and remand for a new trial.

■ The government argues that the admission of Foster's prior conviction amounts to harmless error. It emphasizes that Foster was caught at the border driving a car stuffed with marijuana and smelling strongly of an odor-obscuring fabric softener. It also points out that Foster was wearing ill-fitting clothes and shoes given to him by a person with an unknown last name. Under these circumstances, the government argues, the jury's awareness of Foster's 1991 conviction could not have affected the jury's deliberations and the error, more probably than not, was harmless. *See Glenn*, 667 F.2d at 1274.

■ We disagree. The admission of evidence of a prior conviction may be considered harmless only "if the government can

---

**2.** Of course, such a conviction may be used for impeachment purposes "if the crime was actually committed by fraudulent or deceitful means." *Glenn*, 667 F.2d at 1273; *see also United States v. Murray*, 751 F.2d 1528, 1532 (9th Cir.1985) (concluding that district court made sufficient findings to support admission of prior conviction for receipt of stolen property). In this case, however, the government concedes that the record does not contain sufficient (if any) detail regarding Foster's crime or the circumstances leading to his conviction.

show that it is more likely than not that there is 'a "fair assurance" that the error did not substantially sway the verdict.' " *United States v. Jimenez,* 214 F.3d 1095, 1099 (9th Cir.2000) (quoting *United States v. Alviso,* 152 F.3d 1195, 1199 (9th Cir. 1998)). The government's argument that the error was harmless does not provide the fair assurance necessary to avoid reversal.

At trial, Foster testified on his own behalf and recounted a story that provided a plausible, innocent explanation for his presence in the Mazda at the port of entry and the fact that he was wearing borrowed clothes. Foster testified that he had been living in Mexico for over two years before the date of his arrest and that he had supported himself by playing a guitar and seeking donations. Foster also testified that he had known a used car salesman named "Jessie" for approximately four months. According to Foster, a couple of days before his arrest, his guitar was destroyed and he was left homeless because of a flood. Shortly thereafter, Foster again encountered Jessie, who, when told of Foster's difficulties, offered him shelter and clean clothes. Foster recounted that Jessie offered Foster $100 to drive a used car across the border to a car dealership in San Diego and that he accepted the offer in order to earn enough money to get a hotel room and buy a new guitar. Although less than compelling, this story is plausible.

Likewise, Foster provided plausible explanations for his inconsistent answers given at the port of entry. Foster testified that he had used the name Ken Anderson for several years. He also described his anxiety as events unfolded and he learned there were drugs in the car, and his inability to focus on the agents' questions. It was to impeach Foster's testimony and undermine his credibility that the government repeatedly sought to introduce the fact that Foster had a criminal record, and eventually was able to do so.

Finally, we note that the Mazda exhibited no visible signs of alteration and that the sole evidence linking Foster to the marijuana was that he was driving the car in which it was hidden. Unless Foster had actual knowledge of the marijuana hidden in the car (which he testified he did not), a visual inspection of the car would not have alerted him to the drug's presence. The marijuana was hidden underneath and behind the back seat, inside the passenger and driver side panels and inside the rear bumper—all of which are "natural compartments," or compartments that exist at the time the car is manufactured. Under these circumstances, even the inspector who found the marijuana testified that he could not tell, without a thorough search of the car, that marijuana was present. It is true that the car smelled of fabric softener, but this might not have been significant to a person untrained in drug trafficking. Moreover, Foster testified that he had bad sinus problems, that he had been ill for several days prior to his arrest and that he could not smell the fabric softener.

Given the nature of Foster's explanations, his credibility was of utmost importance—as was the government's ability to question that credibility. We conclude that the erroneous admission of Foster's prior offense was not harmless.

II. *Admissibility of Foster's Statements to Tyson*

Foster also challenges the introduction at trial of several statements he made to Tyson on the night of his arrest. Foster contends that, because he asked to speak with an attorney when arrested, his subsequent statements to Tyson (without counsel present) constituted impermissible interrogation. We address this issue because it is likely to recur in the event Foster is retried.

The conversations in question began when Tyson transported Foster to the second port of entry for detention. At trial, Tyson testified that during the short car ride Foster stated "I guess with this, I am really in trouble." The two then discussed

music and guitars, and Foster said that he hoped he could get a guitar while in jail.[3]

The conversations continued intermittently once Foster and Tyson arrived at the San Ysidro port of entry. During an outdoor cigarette break, Foster noted the poor weather and told the officer that he had probably saved Foster's life that night.[4] The two men also discussed life in Mexico. Foster mentioned that living on the streets in Mexico was dangerous.[5] Foster then volunteered that "desperate men will do stupid things to take care of basic necessities" and that "if this had gone right, he would have ... had some money to have a hotel the next couple days." Finally, while waiting for an elevator, Foster told Tyson that he had been given new clothes earlier that day and that, although his new boots were too big, the clothes were an improvement over what he had been wearing previously.

■■ Foster contends that Tyson purposefully elicited these comments in violation of his *Miranda* rights.[6] Pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a person has a right to the assistance of counsel during custodial interrogations. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held that *Miranda* established that "when an accused has invoked his right to have counsel present," he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. 1880. Moreover, even if an accused initiates further communication, a *Miranda* violation might occur if interrogation ensues. As the Court explained in *Edwards:*

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Id.* at 486 n. 9, 101 S.Ct. 1880.

■■ There is no dispute that Foster invoked his right to counsel before making the statements at issue on this appeal. Rather, the issue is whether the various conversations between Foster and Tyson throughout the evening of January 15, 1998 constituted "interrogation" for purposes of *Miranda*. We review this issue *de novo*. See *United States v. Moreno–Flores*, 33 F.3d 1164, 1168 (9th Cir.1994) ("[W]hether [a] defendant was subjected to interrogation is a mixed question of law and fact reviewed *de novo*.").

■■ Direct questioning by a police officer that leads an accused to make inculpatory statements is the most obvious form of impermissible interrogation, but not all direct questions constitute interrogation. As this court has explained, "[a] definition

---

3. Foster objected to this testimony on discovery violation grounds, but the district court overruled the objections.

4. The district court sustained Foster's objections to this testimony based upon Federal Rule of Evidence 403 and it was stricken from the record.

5. The district court also struck this response.

6. In his reply brief, Foster also challenges the admissibility of his statements under Federal Rule of Criminal Procedure 16, which re-

quires the government to disclose a defendant's statements if so requested. See Fed. R.Evid. 16(a)(1)(A). Foster did not raise this issue in his opening brief, so the government was not provided an opportunity to challenge his contention that it failed to disclose certain statements prior to trial. Thus, this issue was waived. See *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir.1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.").

of interrogation that included any question posed by a police officer would be broader than that required to implement the policy of *Miranda* itself." *United States v. Booth,* 669 F.2d 1231, 1237 (9th Cir.1981). Only questions "reasonably likely to elicit an incriminating response from the suspect" amount to interrogation. *Id.* (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). "[R]elatively innocuous question[s] may, in light of the unusual susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." *Id.* at 1238. "On the other hand it is relevant, but not determinative, that a question posed was not related to the crime or the suspect's participation in it." *Id.*

Foster first contends that Tyson initiated the conversations in question and therefore violated *Miranda.* This contention is not supported by the record. Although it is true that Tyson initiated his first exchange with Foster, Tyson's questions focused on Foster's name, address, date of birth, height and weight. Such limited, biographical questions are permitted even after a person invokes his or her *Miranda* rights; this court and the Supreme Court generally do not view inquiries regarding general biographical information as "interrogation." *See Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (plurality opinion) (establishing a "routine booking question" exception under which questions regarding name, address, height, weight and other general information do not constitute interrogation); *Booth,* 669 F.2d at 1238 ("Ordinarily, the routine gathering of background biographical data will not constitute interrogation."). Application of the "routine booking question" exception is particularly appropriate in the instant case, where Foster's subsequent inculpatory statements were unrelated to Tyson's initial questions and were separated by both time and place from those questions. Thus, Tyson's initial questions at the first port of entry did not amount to the initiation of interrogation by Tyson.

Of course, this conclusion does not end our inquiry. Indirect comments (or coercive actions) by an officer that cause an accused to make inculpatory statements can also constitute interrogation. "Interrogation is defined not only as express questioning but its 'functional equivalent.' " *Moreno–Flores,* 33 F.3d at 1169 (quoting *Innis,* 446 U.S. at 300–01, 100 S.Ct. 1682). The standard for determining whether an officer's comments or actions constitute the "functional equivalent" of interrogation is quite high, however. *See, e.g., id.* at 1169–70 ("The fact that [statements made by an officer] may have struck a responsive chord, or even that they may have constituted 'subtle compulsion' is insufficient to find that they were the functional equivalent of interrogation."). Because "the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Innis,* 446 U.S. at 301–02, 100 S.Ct. 1682.

Foster argues that Tyson's conversations with him were the functional equivalent of interrogation. He suggests that, although the conversations did not include much express questioning by Tyson, Tyson's comments were intended to elicit incriminating remarks by exploiting Foster's weaknesses. In particular, Foster identifies his interest in guitars and previous homelessness as weaknesses.

We are mindful that officers are in positions of strength and superior information when interacting with an accused and, therefore, that conversations occurring after a person invokes his or her *Miranda* rights must be viewed with suspicion and introduced at trial only with the utmost caution. We also recognize that, in some cases, an officer's actions—even absent conversation—might play upon the fears and weaknesses of a defendant in a manner that amounts to interrogation be-

cause it is coercive in nature. As discussed above, however, the hurdle facing Foster is quite high. This is best illustrated by *Rhode Island v. Innis*, in which the Supreme Court rejected Innis's argument that he had been interrogated. *See Innis*, 446 U.S. at 302–03, 100 S.Ct. 1682. While driving Innis to a police station, officers discussed the possibility that nearby handicapped children might find the shotgun used in the robbery and harm themselves. *See id.* at 294–95, 100 S.Ct. 1682. The conversation prompted Innis to ask the officers to turn the car around so that he could lead them to the shotgun. *See id.* at 295, 100 S.Ct. 1682. The Court rejected the argument that this series of events constituted an interrogation by the officers. The Court reasoned that, even if there was "subtle compulsion" at work in the police car, such compulsion did not amount to interrogation unless the officers had reason to know that their comments or actions were "reasonably likely to elicit an incriminating response." *Id.* at 303, 100 S.Ct. 1682. The officers' discussion in *Innis* did not amount to interrogation because "nothing in the record ... suggest[ed] that the officers were aware that the [defendant] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children," *id.* at 302, 100 S.Ct. 1682, or knew that the defendant "was unusually disoriented or upset at the time of his arrest," *id.* at 303, 100 S.Ct. 1682.

Under this framework, the conversations Tyson and Foster engaged in throughout the evening of Foster's arrest simply did not constitute interrogation. Even sitting in our position, with the benefit of hindsight, it is difficult to see how Tyson's comments elicited Foster's responses or how they played upon Foster's "weaknesses" or how Tyson had reason to know what those weaknesses would be. Moreover, as Foster acknowledges, several of the statements in question appear to have had no relation to Tyson's comments. For example, when Tyson revealed that he had once lived in Mexico, Foster volunteered that "desperate men will do stupid things to take care of basic necessities."

We require more than has been presented here to establish that a conversation between an officer and an accused constituted the functional equivalent of interrogation. The district court correctly determined that Foster's statements were not the product of improper interrogation.

## CONCLUSION

Receipt of stolen property is not per se a crime of dishonesty under Federal Rule of Evidence 609(a)(2). The district court erred in allowing the government to use, under Rule 609(a)(2), Foster's prior conviction for receipt of stolen property without first determining whether Foster's commission of the crime actually involved deceitful or fraudulent conduct. The error was not harmless. Foster's present conviction is REVERSED and this case is REMANDED to the district court for further proceedings consistent with this opinion.