**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, <br><br> v. <br><br> JOANN WIGGAN, *Defendant-Appellant*. | No. 10-50114 <br><br> DC No. 2:06-cr-00109-DSF-1 <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
October 9, 2012—Pasadena, California

Filed November 20, 2012

Before: David M. Ebel,[*] Ferdinand F. Fernandez,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Fernandez;
Dissent by Judge Ebel

---

[*] The Honorable David M. Ebel, Senior United States Circuit Judge for the Tenth Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

Reversing a conviction for making a false statement to the FBI and perjury before a grand jury and a district court, the panel held that the district court abused its discretion by admitting the grand jury foreman's testimony that the defendant was not credible.

The panel held that the danger of undue and unfair prejudice far outweighed the probative value of the foreman's testimony, and that the error, which was devastating to the defendant's defense, was not harmless.

The panel rejected the defendant's contentions that the district court erred when it determined that she had not recanted her testimony before the grand jury and that the district court should have submitted the defense of recantation to the petit jury. The panel also rejected the defendant's contention that the evidence was insufficient to support the verdict that she perjured herself at her first trial.

Judge Ebel dissented from the majority's conclusion that the district court committed reversible error in allowing the grand jury foreperson to testify that he did not believe the defendant was being truthful in her testimony before the grand jury.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Cristina Gabrielidis, San Diego, California, for the Defendant-Appellant.

Max B. Shiner, Office of the United States Attorney, Los Angeles, California, for the Plaintiff-Appellee.

## OPINION

FERNANDEZ, Circuit Judge:

Joann Wiggan appeals her conviction and sentence for perjury and for making a false statement. *See* 18 U.S.C. §§ 1001(a), 1623(a). Principally she challenges the district court's admission of testimony from a grand juror. She also challenges the district court's rejection of her claim of recantation, the sufficiency of the evidence, and her sentence. Because we hold that the admission of the grand juror's testimony was unduly prejudicial, we reverse.

## BACKGROUND

Joann Wiggan was a facilities technician at SBC Communications ("SBC"). In that capacity, she had the technical skill and opportunity to implement surreptitious wiretaps. Agents of the Federal Bureau of Investigation interviewed her on October 18, 2004, in connection with an investigation into a wiretapping conspiracy led by Anthony Pellicano. That investigation had revealed that Pellicano's source for the acquisition and implementation of wiretaps was Ray Turner, a former SBC employee who had retired in 2001. By examining Turner's telephone records, the FBI determined that he had contacted SBC employees Michelle

Malkin, Teresa Wright, and Wiggan. The FBI suspected that those individuals were helping Turner implement the wiretaps, and Turner's telephone records indicated that he had made a number of calls to telephone number 323-889-0813, which was a voicemail account at SBC assigned exclusively to Wiggan.

During that October interview, Wiggan admitted that the voicemail account was hers, but she claimed that she had not used that voicemail account in so long that she could not remember the password and that she had only used it to inform callers that she was away from her desk. Wiggan admitted that she had worked with Turner before 1990, but further stated that she had not spoken to him in the last five or six years (*i.e.*, since 1998 or 1999). That was inconsistent with Turner's telephone records, which showed that Turner had called her voicemail multiple times after 1999. Wiggan could not explain why Turner would have called her and insisted that she had not spoken with him during the year 2002.

One year later, on October 26, 2005, Wiggan testified before the grand jury[1] that was investigating the Pellicano conspiracy. She admitted that the voicemail account had been assigned to her since 2000, but she claimed that she did not use it at all until 2003. She also testified that she knew Turner because they had worked together in the 1980s, and that while they were acquaintances, they did not socialize outside of work. However, she did say that she had a chance meeting with Turner in 2000 or 2001. She indicated that she spoke to him about her marital problems, and that she and

---

[1] Hereafter we will refer to this particular grand jury as the "Grand Jury."

Turner talked on the telephone about those problems approximately ten times, but she then testified that she had not had any conversations with Turner after December 2000.

Upon being shown Turner's records and seeing a large number of calls from Turner to her voicemail, Wiggan claimed that she had never received any of those calls and did not use her voicemail prior to 2003. She asserted that she first activated her voicemail in 2003, and even then she never retrieved any messages from the voicemail. She was reminded a few times that she was testifying under oath, was subject to the penalties of perjury, and that her telephone records could be subpoenaed.

A few days after that appearance, Wiggan left a message for the prosecutor saying that she wished to correct some of her Grand Jury testimony. She then appeared before the Grand Jury again on January 11, 2006, and testified that on her way home after her first day of testimony, her husband had told her that he thought she was using her voicemail during the period in question. She said that she thought he might be right, and that she "might have accessed it." She also acknowledged that the voicemail was activated prior to 2003, but she could not remember how often she had actually accessed it or when she began or stopped using it. She still denied having retrieved any messages left by Turner and claimed that she had just retrieved a few messages from her boss or from her husband. Moreover, she said that she had not used her voicemail in the years prior to 2003, so that SBC had to activate her voicemail that year. However, upon close questioning and after much tergiversation, when asked whether her prior testimony that she had never used her voicemail before 2003 was true or false, she replied, "False. My husband said I did."

Wiggan was indicted on five counts of perjury on February 15, 2006. Those counts all stemmed from her two days of testimony before the Grand Jury. Trial began in September of 2006, and she testified in her own defense. At trial Wiggan admitted that she had spoken with Turner from 2001 to 2003, even though she had previously denied that, but reiterated that she could not recall having received any voicemail from him. She also testified that because she could not remember receiving voicemail from Turner, it was not possible that she had received any. Wiggan then said that most of the messages she received on voicemail were annoying complaints from her children, so she did not check voicemail very often. The jury acquitted Wiggan on most counts of the indictment, but deadlocked on Count Three, on which the district court later granted a mistrial.

A first superseding indictment was then returned against Wiggan. Count Two realleged the mistried count from the original indictment; that is, Wiggan's testimony in her first appearance before the Grand Jury that she never retrieved any messages from her voicemail account was false.[2] Count One charged that Wiggan had made a false statement when she told the FBI in 2004 that she had not spoken with Turner in five or six years. Count Three alleged that Wiggan had perjured herself at her 2006 trial when she testified that she

---

[2]     Q. Is it your testimony here today that as far as your SBC voicemail account, (323) 889-0813, that during the entire time that account was assigned to you, you never retrieved a single message from that account; is that correct?

A. Yes.

could not remember if she had ever received a voicemail message from Turner.**[3]**

At the 2009 trial, the government called the Grand Jury foreman, Thomas Venable, to testify regarding the materiality of Wiggan's statement to the Grand Jury, the atmosphere of the Grand Jury room, Wiggan's demeanor, and the demeanor of the grand jurors and the prosecutor during her testimony. Venable also testified a number of times that he and the other grand jurors did not think that Wiggan was credible or believable. Venable had not testified at Wiggan's first trial.

At her 2009 trial, Wiggan testified in her own defense. She denied that she ever told the FBI that she had not spoken to Turner in five or six years. She reiterated her claim that at the time of her Grand Jury testimony, she did not remember that she had used her voicemail and that she had been reminded of that by her husband at a later time. She also said that she told the truth at her 2006 trial when she said that she did not remember receiving any voicemail from Turner, and she reiterated her testimony from that trial that most of the voicemail messages she had received were annoying messages from her children.

Wiggan's son, Chaz Wiggan, testified that he and his sister, Linnett, frequently called Wiggan's voicemail

---

[3]      Q. Did you ever call your voicemail and have a voicemail from Ray Turner?

     A. Not that I can remember, no.

regarding their disagreements.**[4]** He also testified that when he left voicemails, he expected that Wiggan would receive the messages and call him back.

Wiggan was convicted and sentenced on all counts. This appeal followed.

## **JURISDICTION AND STANDARDS OF REVIEW**

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We typically review the admission of evidence for an abuse of discretion. *See United States v. Hankey*, 203 F.3d 1160, 1166 (9th Cir. 2000); *see also Boyd v. City & Cnty. of S.F.*, 576 F.3d 938, 948 (9th Cir. 2009). "A district court's decision to exclude or admit evidence under [Federal Rule of Evidence] 403 is reviewed with considerable deference." *Hankey*, 203 F.3d at 1167 (internal quotation marks omitted); *see also Boyd*, 576 F.3d at 948.

"We review the district court's denial of the motion to dismiss the [i]ndictment de novo," but review the underlying factual findings for clear error. *United States v. Marguet-Pillado*, 560 F.3d 1078, 1081 (9th Cir. 2009).

We review the district court's decision to exclude evidence of a claimed defense de novo. *United States v. Schafer*, 625 F.3d 629, 637 (9th Cir. 2010), *cert. denied*, __ U.S. __, 131 S. Ct. 2919, 179 L. Ed. 2d 1259 (2011). We also review whether a defense is legally cognizable de novo, but

---

**[4]** Linnett did not testify at the 2009 trial, but she had told the Grand Jury that she never called Wiggan at work because she did not have Wiggan's work phone numbers.

review whether the factual foundation was sufficient to warrant a jury instruction for an abuse of discretion. *See United States v. Perdomo-Espana*, 522 F.3d 983, 986 (9th Cir. 2008).

We review de novo the district court's denial of a Federal Rule of Criminal Procedure 29 motion for judgment of acquittal. *United States v. Williams*, 547 F.3d 1187, 1195 n.6 (9th Cir. 2008). In reviewing the sufficiency of the evidence, we "construe the evidence 'in the light most favorable to the prosecution,'" and then ask "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010) (en banc).

## DISCUSSION

Despite evidence of a good deal of telephonic contact between Ray Turner and Wiggan, she asserted that there was little or none. While there was evidence of fifty-three calls between her home and his from December 1999 to February 2003, she told the FBI agents that she had not had contact with Turner during that time. And, while there was evidence that Turner made 127 calls to her voicemail account from December 1999 to December 2002, she testified at her first trial that she did not remember retrieving any of those calls, and told the Grand Jury that she had not actually retrieved any messages whatsoever from that account. Thus, this prosecution for false statements and perjury followed. She was convicted, sentenced, and now points to a number of claimed errors at trial. We will consider her claims in turn.

## A. Federal Rule of Evidence 403

The first issue before us is Wiggan's claim that pursuant to Federal Rule of Evidence 403 ("Rule 403"), the district court should have excluded the testimony of Thomas Venable, who was the foreman of the Grand Jury before which Wiggan appeared. That was the Grand Jury which also issued the present indictment against her. Whatever the ultimate validity of any particular decision to admit testimony from members of a grand jury that issued an indictment against a defendant might be, admitting that evidence is sensitive and even dangerous. It is redolent of peril to the fairness of the trial itself.[5]

We have indicated that grand jurors' testimony can be admitted on questions regarding the materiality of a defendant's testimony to a grand jury's investigation. *See United States v. Leon-Reyes*, 177 F.3d 816, 820 (9th Cir. 1999) ("[W]e have allowed the prosecution to prove materiality . . . by presenting testimony from a member of the grand jury . . . .").[6] We have not commented on grand juror testimony that extends beyond the materiality issue; nor have we reflected on the dangers that grand juror testimony

---

[5] It also implicates some of the concerns reflected in Federal Rule of Evidence 606(b). That is, it threatens to subject grand jurors to annoyance, embarrassment and exposure of the grand jury's internal decisionmaking process. *See* Fed. R. Evid. 606(b) advisory committee's note. Thus, it can endanger the grand jury system itself. However, that is not our focus in this case.

[6] The elements of perjury include materiality. *See United States v. McKenna*, 327 F.3d 830, 838 (9th Cir. 2003) (indicating that materiality is one of the elements).

presents.  However, we have alluded to the dangers presented when judges testify.

In *Chein v. Shumsky*, 373 F.3d 978, 989 n.6 (9th Cir. 2004) (en banc), we indicated our disquiet when we noted that "[a]lthough we do not reach the merits of that challenge, the likely impact on the jury of a sitting state court judge pronouncing the existence of an essential element of a crime, while vigorously denouncing the defendant and his credentials, is difficult to ignore[,]" and then went on to reflect "that this highly unusual testimony at least explains why the jury returned a guilty verdict on sparse, constitutionally insufficient evidence."  Similarly, in *United States v. Sine*, 493 F.3d 1021, 1033 (9th Cir. 2007), while the judge in question did not testify, the prosecution used his order, which contained derogatory "findings and determinations relevant to credibility."  We pointed out that "jurors are likely to defer to findings and determinations relevant to credibility made by an authoritative, professional factfinder rather than determine those issues for themselves." *Id.* at 1033–34.  And we approvingly cited a decision from the Fourth Circuit Court of Appeals,[7] where it noted that "judicial findings of fact present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice."  *Id.* at 1034 (internal quotation marks omitted).  That, of course, does not mean that a judge's testimony or the use of a judge's findings and conclusions will always result in unfair prejudice to the defendant, but when their use is proposed, courts should proceed cautiously.

---

[7] *Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir. 1993).

While use of a grand juror's testimony does not generate exactly the same concerns as use of a judge's testimony, the dangers are rather similar. We have not so declared, but courts in the Second Circuit have had occasion to do so, and we agree with their assessment.**[8]** Osama Awadallah, a citizen of Jordan, was questioned by a grand jury regarding the September 11, 2001, terrorist attacks. *United States v. Awadallah (Awadallah I)*, 401 F. Supp. 2d 308, 310–11 (S.D.N.Y. 2005). As a result of his answers, he was ultimately charged with perjury, and the government sought to call grand jurors to testify about the "physical conditions" of the grand jury room and about Awadallah's "physical appearance," as well as the "behavior and manner of the prosecutor." *Id.* at 313. The government also wished to have the grand jurors testify about "whether, in their opinion, Awadallah's testimony was knowingly false, or whether Awadallah appeared 'confused' during his testimony." *Id.*

In a pretrial ruling, the district court permitted the former two lines of questioning, but not the latter one. *Id.* One basis for the exclusion was Rule 403. In reaching that conclusion, the district court pointed to a number of sources of possible prejudice. It was concerned that the trial jurors would give undue weight to grand juror testimony because they would

---

**[8]** We do not overlook the brief, unexplained comment in a footnote in one other case. *See United States v. Frazier*, 944 F.2d 820, 822 n.1 (11th Cir. 1991). There, the court simply stated in a sentence disposing of many other arguments by the defendant that: "We find meritless Frazier's arguments that she was denied a fair trial by . . . a grand juror's testimony that called her testimony before the grand jury 'evasive.'" *Id.* We just do not find that brief statement to be very illuminating; neither the justification for the evidence admitted in *Frazier* nor its potential for prejudice in the context of the particular trial is ascertainable from the opinion.

"regard the grand jurors as their peers,"[9] and be tempted to "defer" to the grand jurors' perceptions of falsity rather than making their own assessments.[10] It also saw real danger in that because "any testimony from a grand juror that Awadallah appeared not to be confused, or that he appeared lucid and coherent, is tantamount to a statement that, in the grand juror's opinion, Awadallah's statements were knowingly false." *Id.* at 319. In addition, the district court was concerned that trial jurors might well "interpret the grand jurors' testimony as proof that Awadallah has already been found to have committed perjury by a jury of his and their peers." *Id.* The long-standing rule is that the indictment itself "is not evidence against the accused and affords no inference of guilt or innocence,"[11] and "use of grand jurors to testify, in essence, as to their opinion of [a defendant's] guilt and their reasons for indicting him, is squarely at odds with that policy."[12]

On the government's interlocutory appeal from the district court's ruling, the Second Circuit Court of Appeals affirmed. *United States v. Awadallah (Awadallah II)*, 436 F.3d 125 (2d Cir. 2006). That court, of course, reviewed the district court's decision for abuse of discretion, and gave the district court the deference it was due. *Id.* at 131. The court of appeals noted that the district court acted well within its discretion when it:

---

[9] *Id.* at 318.

[10] *Id.*

[11] *United States v. Ramirez*, 710 F.2d 535, 545 (9th Cir. 1983).

[12] *Awadallah I*, 401 F. Supp. at 319.

concluded that permitting testimony by grand jurors regarding whether or not, in their opinion, the defendant's false statements were the product of confusion and/or intimidation potentially causes significant prejudice to the defendant because it could be interpreted as a grand juror giving the petit jurors advice on how to determine the central issue of the case.

*Id.* at 133–34. To the government's contention that it only sought demeanor and appearance evidence, the court responded: "This distinction draws an extremely fine line, one best entrusted to the trial court's expertise. Here, the court could easily view the proffered testimony as opinion and advice regarding the defendant's mental state, the key element in the case." *Id.* at 134. And, while the line between "permissible statements regarding objective manifestations and impermissible statements of subjective opinions"**[13]** would be difficult to maintain, the court of appeals left that delicate task to the district court.**[14]**

Because we agree that many dangers are subtended when a grand juror testifies, especially when that testimony goes beyond mere materiality and objectively physical matters, we cannot ignore that brooding brume as we turn to the Rule 403 analysis.

Although relevant evidence is generally admissible,**[15]** Rule 403 provides: "The court may exclude relevant

---

**[13]** *Id.*

**[14]** *Id.* at 135.

**[15]** *See* Fed. R. Evid. 401, 402.

evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice . . . ." Relevance is a fairly coarse filter,**[16]** and when evidence is minimally relevant, it is likely to be minimally probative as well.**[17]** Moreover, a decision regarding probative value must be influenced by the availability of other sources of evidence on the point in question. *See Old Chief v. United States*, 519 U.S. 172, 182–85, 117 S. Ct. 644, 651–52, 136 L. Ed. 2d 574 (1997); *Awadallah II*, 436 F.3d at 132. And, as we have noted: "Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992).

With all of that in the background, we must consider exactly what happened here in some detail. Here, Venable did testify about the materiality of Wiggan's answers before the Grand Jury. He also testified about the physical arrangement of the Grand Jury room. So far, so good. But, Venable then went on to testify about Wiggan's demeanor and, thus, entered the region that gave the Second Circuit courts concern. *See Awadallah II*, 436 F.3d at 134; *Awadallah I*, 401 F. Supp. 2d at 319. Among other things, he testified that Wiggan was belligerent, quick to respond to questions, inattentive to documents shown to her, repeatedly adamant, and did not appear intimidated, confused or forgetful. And the testimony did not stop there either. Rather, Venable went on to testify to his (and even the other Grand Jurors') opinion that Wiggan was not credible. Nor was that a single passing reference; it was repeated many

**[16]** *See United States v. Vallejo*, 237 F.3d 1008, 1015 (9th Cir. 2001).

**[17]** *See Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).

times.**[18]** As we will show, that testimony cannot possibly pass

---

**[18]** Here are those references:

> Q. Did you find that testimony credible?
>
> . . . .
>
> THE WITNESS: We did not find – the grand jury did not find or feel that it was credible responses to the questioning.
>
> Q. Based on the evidence that you had gathered and based on the defendant's entire testimony before the grand jury on both occasions, did you find the story that she told about how she was reminded in the car on the way home by her husband that she had used her voicemail to – did you find that credible?
>
> . . . .
>
> THE WITNESS: My opinion was it was not credible.
>
> Q. And with respect to the entirety of her second grand jury appearance, did you find her testimony credible?
>
> . . . .
>
> THE WITNESS: . . . . No. It was no more consistent – it's not credible.
>
> Q. Did the defendant's testimony during her second grand jury appearance in any way alleviate your concerns as foreman of the grand jury as to whether the defendant was being candid and truthful in her testimony?

Rule 403 analysis.

**(1) Relevance and Probative Value:** If Venable's testimony regarding credibility was relevant at all, it was rather weakly so. The government suggests that it was relevant to the materiality of Wiggan's answers to the Grand Jury investigation, but we fail to see how that can be so. Whether she was credible or not (and regardless of her answers), the information sought either was, or was not, material to the Grand Jury. By the same token, while the layout of the Grand Jury room and the way Wiggan objectively behaved, might have relevance to whether she was intimidated or confused, testimony that a Grand Juror thought that she was, or was not, confused or intimidated, in fact, is less relevant to her state of mind. And, while the statement in the Grand Juror's opinion that she was not credible does, undoubtedly, indicate that Venable, and others, thought that Wiggan's testimony was false, and has some relevance, it is not particularly probative.[19]

---

> A. I did not feel that she was being candid and truthful with the grand jury.
>
> Q. Did that change at all as a result of her second grand jury appearance?
>
> A. No, it did not change.
>
> A. In my opinion, it was extremely obvious to everybody in the room that we were not being – the grand jury was not being given the truth.

[19] The lack of probative value is underscored by the fact that the opinion regarding credibility was not particularly "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701(b). The jury already had the evidence that formed the basis of his opinion. *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d

Much of the evidence in question was available in other forms—by alternative means—without risking the dangers of unfairness that use of a grand juror's testimony would present. As the Second Circuit Court of Appeals pointed out, other persons present in the Grand Jury room could have been brought forward,[20] and, in fact, much of the pertinent information—whether she was adamant or confused or forgetful or belligerent—could be gleaned from the Grand Jury transcript. Moreover, the objective evidence of Wiggan's behavior was more probative than Venable's opinion about that behavior. And, as far as pursuing cases of perjury related to testimony before a grand jury is concerned, we, like the other courts that have opined on this subject, find it curious that the government found it necessary to pursue this particular testimonial approach, when "the Government has tried hundreds, if not thousands, of perjury cases without eliciting opinion evidence from a grand juror to prove knowledge. None of our opinions indicate that a grand juror has ever previously been called in this Circuit to give such testimony and . . . ." *Id.* at 132; *see also Awadallah I*, 401 F. Supp. 2d at 315, 320. That, too, strongly suggests that alternative means of pursuing the same ends were readily available, and that the evidence was weakly probative.

But, even given the existence of some probative value, we must still consider whether there was undue prejudice.

**(2) Prejudice:** We have already spoken to the serious dangers that exist when grand jurors are called to testify. All

---

1051, 1059–60 (9th Cir. 2008); *United States v. Henke*, 222 F.3d 633, 641–42 (9th Cir. 2000) (per curiam).

[20] *Awadallah II*, 436 F.3d at 132–33.

of those presented themselves in this case.  In fact, it is rather apparent that the possible undue prejudice that caused the courts in the *Awadallah* cases to shudder reified here.  Those courts wanted to avoid even suggesting to the petit jurors that grand jurors thought a defendant was a liar.  *See Awadallah I*, 401 F. Supp. 2d at 318–19.  And the district  court was concerned enough that it concluded that grand jurors "may not testify as to their mental impressions: *i.e.*, that [the defendant] did or did not appear lucid or composed, or did or did not appear confused, or that the prosecutor did or did not appear to be intimidating." *Id.* at 320.  In this case, there was not a mere hint or mental impression about Wiggan's truthfulness; there was an outright statement that she was not credible.    Regardless of the other testimony, the direct testimony regarding credibility stepped over the line.

Moreover, it is worth noting that the prejudice here was exacerbated by evidence that Venable, the Grand Jury foreman, and, by the way, his fellow grand jurors, had sat for two years, heard 100 to 150 cases (some lengthy) and heard in the neighborhood of 200 to 300[21] witnesses during that time.  In other words, Venable (and the others) had a lot of experience in judging witnesses' testimony.  That could only emphasize the impression that he was expert in the process of witness evaluation, and should be given special credence.[22] To make matters worse, he also ultimately testified on redirect examination that the Grand Jurors were the victims

---

[21] The government specifically mentioned this to the jury in its closing argument.

[22] That threatens the same sort of danger that emanates from testimony by sitting judges.  *See Sine*, 493 F.3d at 1033–34.

of Wiggan's crime,[23] and that of the hundreds of witnesses heard by them, she was the only one they had indicted for perjury before them.[24]  That exacerbated the damage already wrought by the improper credibility evidence.

In short, while we do recognize our duty to give the district court a great deal of leeway in this area,[25] we are constrained to hold that it did abuse its discretion when it admitted Venable's testimony that Wiggan was not credible — the danger of undue and unfair prejudice far outweighed the probative value of the evidence.

Nor can we say that the error was harmless; that is, we are unable to hold that "it is more probable than not that the error did not materially affect the verdict." *Boyd*, 576 F.3d at 949 (internal quotation marks omitted); *United States v. Liera*, 585 F.3d 1237, 1244 (9th Cir. 2009).  Credibility was at the very heart of this case, and Wiggan's testimony was the most

---

[23]      Q. To the extent that those lies caused your grand jury to do additional work or not reach the outcome of an investigation, were you a victim of that crime?

A. Yes, we were.

Q. And your fellow grand jurors?

A. Yes, I was.  Yes, we were.

[24]      Q. Out of the hundreds of witnesses whom your grand jury heard from in the course of its two years of service, nervous or otherwise, how many did the grand jury seek to charge with perjury?

A. Just one, Mrs. Wiggan.

[25] *See Boyd*, 576 F.3d at 948; *Hankey*, 203 F.3d at 1167.

important evidence that the defense could present on that topic. *See United States v. Foster*, 227 F.3d 1096, 1101 (9th Cir. 2000); *United States v. Mejia*, 529 F.2d 995, 996 (9th Cir. 1976) (per curiam). Moreover, we cannot accept the government's suggestion that there was no prejudice because the jury already knew that the Grand Jury did not believe Wiggan when it indicted her. That argument overlooks the fact that an indictment is not evidence; that the very fact was one of the major concerns of the courts in the Second Circuit. *See Awadallah II*, 436 F.3d at 133; *Awadallah I*, 401 F. Supp. 2d at 319. It concerns us also, and does not help the government's position.

Also, an indictment need only be based on probable cause. So the testimony that the Grand Jury did not believe Wiggan was telling the truth—as opposed to having probable cause to believe that she was not telling the truth—does go beyond the determination needed for the indictment.

In fine, we hold that Wiggan's convictions must be reversed due to the admission of Venable's highly prejudicial testimony against her. While we recognize that his testimony directly involved only Count Two of the indictment (perjury before the Grand Jury), we are unable to cabin the effect of that testimony to Count Two alone, and the government has not asked us to do so. Thus, we reverse and remand as to all three counts.[26]

---

[26] Because we hold that the evidence should have been excluded pursuant to Rule 403, we need not, and do not, opine on whether it was also excludable under Federal Rules of Evidence 701 and 606(b). Nor need we opine on Wiggan's claim that the testimony of the Grand Jury foreman denied her an impartial petit jury.

## B. Recantation

Wiggan also claims that the district court erred when it determined that she had not recanted her testimony before the Grand Jury, and that the district court should have submitted the defense of recantation to the petit jury. While our reversal of Wiggan's conviction makes a decision regarding recantation strictly unnecessary to resolution of this appeal, we will decide the issue because it is likely to arise on any retrial. *See United States v. Sayetsitty*, 107 F.3d 1405, 1411 (9th Cir. 1997).

After Wiggan's first appearance before the Grand Jury, she appeared a second time and, she says, recanted her prior erroneous statements. Were it true that she made a timely recantation, her prosecution on Count Two might have been barred.[27] She did not do so, and the district court did not err when it determined that § 1623(d) did not apply.

Recantation requires a defendant "to renounce and withdraw" the prior statement. *Llanos-Senarillos v. United States*, 177 F.2d 164, 166 (9th Cir. 1949). And the defendant "must unequivocally repudiate his prior testimony to satisfy

---

[27] The applicable perjury statute contains the following provision:

> Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

18 U.S.C. § 1623(d).

§ 1623(d)." *United States v. Tobias*, 863 F.2d 685, 689 (9th Cir. 1988). It is not enough if the defendant "merely attempted to explain his inconsistent statements," but never really admitted to the facts in question. *Id.* And, as we have pointed out: "Testimony which serves to cast doubt as to the truth of that which is perjurious is not a recantation. Being a poor liar does not make one a repentant sinner." *United States v. Anfield*, 539 F.2d 674, 679 (9th Cir. 1976). What recantation requires is "[a]n outright retraction and repudiation of . . . false testimony"; that "is essential to a 'recantation' within the meaning of the statute." *United States v. D'Auria*, 672 F.2d 1085, 1092 (2d Cir. 1982). Mere attempts to "clarify" rather than actually change one's testimony will not do. *Id.*

On this record, it is plain that if Wiggan did give perjurious testimony at her first appearance, her statements at her second appearance were not sufficient to deflect the consequences. Rather, she attempted to spin an excuse for the falsity, and even then hedged her bet. So when she, after some close questioning, finally agreed that the statement in question was "false," she immediately followed that with the further statement: "My husband said I did." So even then, she remained equivocal, and, in effect, only admitted to a possible error.[28]

But even if we accepted Wiggan's hedged statements as a recantation, they amounted to no more than an attempt to tailor her "testimony to [the evidence that the government possessed] rather than [giving her] truthful recollection of the

---

[28] Notably that the statement came in the context of others where she denied any memory of access, stated her husband might be right, and that she might have used it. As the district court found, "her January 11, 2006 grand jury testimony was filled with hedging and ambiguity."

facts." *Id.*; *see also Tobias*, 863 F.2d at 689 (finding *D'Auria* "persuasive"). That is, it had "become manifest" that the falsity of her statements "[had] been or [would] be exposed." 18 U.S.C. § 1623(d); *see also United States v. Scivola*, 766 F.2d 37, 46 (1st Cir. 1985); *United States v. Scrimgeour*, 636 F.2d 1019, 1021–22 (5th Cir. 1981). She then adjusted her testimony as a reaction to that reality. Moreover, it is apparent that her false statement had already materially affected the proceeding; it had caused considerable additional work for the Grand Jury.**[29]** *See* 18 U.S.C. § 1623(d). As the district court declared, the government proved beyond a reasonable doubt that the recantation defense did not apply. *See Tobias*, 863 F.2d at 688.

But, argues Wiggan, her recantation defense should have been submitted to the jury. However, § 1623(d) does not suggest that it is a defense at the trial itself. Rather, it declares that a repudiation "shall bar prosecution." *Id.* As such, the recantation claim is one that should be raised with the district court before trial. In fact: "It is common ground that the issue whether an effective and timely recantation has been made is one of law to be decided by the court." *United States v. Goguen*, 723 F.2d 1012, 1017 (1st Cir. 1983). The Second Circuit Court of Appeals has also declared that "[w]hether a valid offer to recant has been made is an issue of law that must be decided by the court." *D'Auria*, 672 F.2d at 1091; *see also United States v. Fornaro*, 894 F.2d 508, 51\1 (2d Cir. 1990) (per curiam). And the Fifth Circuit Court of Appeals agrees. *See United States v. Denison*, 663 F.2d 611, 618 (5th Cir. Dec. 1981) (holding "that the defense of recantation must be raised before trial under Federal Rule of

---

**[29]** We note that as a result of her statements, the Grand Jury was required to subpoena more documents and witnesses.

Criminal Procedure 12(b)(2) [now 12(b)(3)] as a jurisdictional bar to prosecution"). We have not held to the contrary. Our discussion in *Tobias*, 863 F.2d at 688, might be read as suggesting that recantation was a jury question. However we did not so state, and that issue was not part of the case, which involved a bench trial. *Id.* at 687. We now agree with the other circuits that the repudiation issue is one for the court itself.[30]

## C. Insufficiency of the Evidence

Wiggan then asserts that the evidence was insufficient to support the verdict that she perjured herself at her first trial (Count Three).[31] We disagree. No doubt the government was required to prove that Wiggan's false, material statement regarding voicemails from Ray Turner was made "knowingly." *McKenna*, 327 F.3d at 838. There was ample evidence to that effect.

When a memory lapse is claimed, the government may submit, and support its case with, circumstantial evidence. *See Gebhard v. United States*, 422 F.2d 281, 288 (9th Cir. 1970); *see also United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007); *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1190 (9th Cir. 2002). In fact, when the claim is

---

[30] We do not hold that evidence of steps taken to allegedly repudiate can never be admitted at trial. For example, at trial a district court might admit that kind of evidence, as the district court did here, to support a claim that no untruth was ever intended in the first place.

[31] We consider this issue because Wiggan could not be retried if the evidence was insufficient. *United States v. Shipsey*, 190 F.3d 1081, 1088 (9th Cir. 1999).

memory loss, that may well be the only evidence available. *See Gebhard*, 422 F.2d at 287–88.

Here, the sheer number of calls by Turner to Wiggan's voicemail (127 in all), Wiggan's own calls to her voicemail, which were long enough to retrieve messages, and the timing of those calls constituted circumstantial evidence of her guilt. That was especially true where she was unable to offer evidence to explain why she received but did not retrieve those calls, and we, of course, cannot overlook the issue of her own credibility. All in all, the evidence sufficed to support the jury's guilty verdict beyond a reasonable doubt. *See Nevils*, 598 F.3d at 1164.

Wiggan's argument that, in effect, the evidence could also sustain a determination that she had a failure of memory and did not, therefore, knowingly tell a falsehood does not undermine the jury's determination. As we have carefully explained, we do not "ask whether a finder of fact could have construed the evidence produced at trial to support acquittal." *Id.* That is, we do not construe the "evidence in a manner favoring innocence rather than in a manner favoring the prosecution." *Id.* at 1167. We, therefore, reject Wiggan's invitation to do just that.[32]

## CONCLUSION

When Wiggan was prosecuted for false statements and perjury, her credibility was crucial because her defense depended largely on her own testimony that she had, at most, made a mistake rather than knowingly lied. On the record

---

[32] Because we reverse the convictions, we need not, and do not, take up the sentencing issues raised by Wiggan.

before us, the erroneous admission of the testimony of the Grand Jury foreman setting out his opinion about her credibility, which had some probative value but was unduly prejudicial, was both an error and devastating to her defense. We are, therefore, constrained to reverse her convictions and remand.

REVERSED and REMANDED.

EBEL, Circuit Judge, dissenting:

I join in the parts of the majority opinion finding no error in the district court's ruling declining to submit the recantation defense to the jury and determining that the evidence was sufficient to support Ms. Wiggan's conviction for the count of perjury at her first trial. However, I respectfully dissent from the majority opinion concluding that the district court committed reversible error in allowing the grand jury foreperson, Mr. Venable, to testify that he did not believe that Ms. Wiggan was being truthful in her testimony before the grand jury.

I readily acknowledge the paucity of precedent on whether it is error to submit testimony from a grand juror on a defendant's demeanor or credibility as part of the Government's evidence in support of a charge that the defendant committed perjury before the grand jury. As the majority opinion accurately notes, the other federal circuit case that has directly considered the issue before us in any substantive way is *United States v. Awadallah (Awadallah II)*,

436 F.3d 125 (2d Cir. 2006).**[1]** In that case, the Second Circuit found that the district court had not committed an abuse of discretion in *excluding* such evidence. *Id.* at 131. Although *Awadallah II* clearly disapproved of the practice of calling grand jurors to testify before the petit jury regarding the defendant's demeanor or credibility on a charge that the defendant had committed perjury before the grand jury, the case is not strictly on point because, in that case, the Second Circuit *affirmed* a district court decision *excluding* such evidence. *Id.* In our case, on the other hand, we are being asked by the plaintiff to *reverse* a district court decision admitting such evidence. To me, that distinction makes all the difference.

We must give great deference to a district court's evidentiary rulings, and we may reverse only if we find a clear abuse of discretion—which is a very high bar. *See United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (explaining that "[a] district court's decision to exclude or admit evidence under FRE 403 is reviewed with considerable deference" (internal quotation marks omitted)); *see also United States v. Higuera-Llamos*, 574 F.3d 1206, 1209 (9th Cir. 2009) ("The district court is to be given wide latitude when it balances the prejudicial effect of proffered evidence against its probative value." (internal quotation marks omitted)). Here, although I agree with the majority that there are dangers in calling a grand juror to testify about alleged false statements made to the grand jury, in this case, I do not

---

**[1]** There is one other federal circuit case that briefly addresses the issue, *United States v. Frazier*, 944 F.2d 820, 822 n.1 (11th Cir. 1991). That case found no error in admitting testimony from a member of the grand jury to prove perjury before the grand jury. As the majority opinion aptly notes, however, there was no meaningful discussion of the issue in *Frazier*.

believe that the ruling is so clearly unsupportable that we should reverse.

This case comes before us to review a ruling under Federal Rule of Evidence 403, which requires determining whether the "probative value [of the evidence] is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403.

As to the probative value of this evidence, I think it is fairly significant. The issue that the petit jury had to decide was whether Ms. Wiggan was truthful in her testimony before the grand jury. The people to whom she was speaking, the grand jurors, are in the best position to judge her truthfulness. They are the only ones who observed her demeanor, body language, context, and the like. Those characteristics are probative of whether the speaker is being truthful or not. Yet, they are not as clearly revealed from the cold transcript of her grand jury testimony as they are from grand juror Venable's testimony. Judgments of the truthfulness of someone's statements are often subtle and even subjective, but all of that can be probed by cross-examination. In my opinion, there is no better evidence of whether a witness is being truthful before the grand jury than the testimony of grand jurors who heard and observed the witness's testimony.

On the other side of the equation, I acknowledge that a grand juror's testimony presents the potential for prejudice. The Ninth Circuit has disapproved of the admission of derogatory statements *from a judge* concerning a defendant's credibility because a judge is an "authoritative, professional fact finder" who is apt to carry excessive weight with the jury. *United States v. Sine*, 493 F.3d 1021, 1033-34 (9th Cir. 2007); *see id.* at 1031 (agreeing with a defendant that "derogatory factual findings and comments" from a judge's

order in a prior related case created "too great a danger of unfair prejudice and thus violated Rule 403"). *But see id.* at 1034 ("Our determination that references to facts found in a judicial opinion can unfairly prejudice a party does not mean that admission of such facts will *always* fail the balancing test of Rule 403."). However, I do not see quite the same danger when the evidence comes from a grand juror who is not a professional fact finder, and to the contrary is presumably chosen from a random jury pool, similar to the pool of people selected for petit jurors.

Indeed, several statements made by Mr. Venable ameliorate any potential concern in this regard because he repeatedly explained that it was the petit jury's responsibility to assess the evidence and make a determination. At one point in his testimony, Mr. Venable stated, "We felt, as a grand jury, that there was enough evidence in Mrs. Wiggan's case to turn it over to a petit jury, and that then becomes this jury's responsibility to review, listen to all sides, all the testimony, and make a decision." He then reiterated, "[W]e as a grand jury, felt that there was enough evidence present to turn it over to this jury. What this jury decides to do and how they decide and finally handle it belongs to this jury, not to me or the grand jury." (3 ER 499.) Further, he stated "I have done my job as a grand jury [sic]. It's now been turned over, and however that comes out, that's the way it comes out. I have no further interest in it."

Moreover, any potential prejudice from a grand juror's testimony can be greatly ameliorated by cautionary instructions to the petit jury. Here, Ms. Wiggan has not indicated that she ever requested a limiting jury instruction related to the testimony of Mr. Venable. Further, although defense counsel filed a motion in limine to preclude Mr. Venable's testimony prior to trial, the district court held that

a ruling on "the scope of the foreman's demeanor testimony . . . must await proffer of the testimony at trial." Although defense counsel objected multiple times during the presentation of the testimony, counsel never objected to any statement made by Mr. Venable during the trial on the explicit grounds that it was unduly prejudicial under Rule 403.

Indeed, even if the court had abused its discretion in allowing certain statements made by Mr. Venable, given defense counsel's failure to object to any specific testimony, under a plain error standard, I would conclude that Ms. Wiggan has failed to meet this standard because her "substantial rights" were not violated in light of the weight of the evidence against her. *See Sine*, 493 F.3d at 1031 (holding that "although we agree that the many references to [the] adverse findings and comments" of the judge from an order in a prior related matter "should not have been allowed, the plain error standard of review proves fatal to [the defendant's] contention that the conviction should be reversed because of those references"); *id.* at 1041 ("[T]he defendant completely failed to object to the government's repeated impermissible references to the judge's order. Because the trial judge's failure *sua sponte* to prevent such references did not affect [the defendant's] substantial rights in a case where other evidence overwhelmingly proved the defendant's guilt, [his] conviction must stand.").

I am troubled about testimony from Mr. Venable that seemed to speak on behalf of the entire grand jury.**[2]** I believe

---

**[2]** During his testimony, the prosecution asked Mr. Venable if he found credible Ms. Wiggan's testimony before the grand jury that she had never received any of the messages that Turner left for her. Mr. Venable responded, "We did not find—the grand jury did not find or feel that it was credible responses to the questioning."

that testimony is improper, but the prejudicial effect of that was blunted when the district court instructed Mr. Venable, in the presence of the jurors, to only testify on his own behalf and not on behalf of the other jurors.**[3]**

---

Additionally, the following exchanges took place during Mr. Venable's testimony:

> PROSECUTION: Did I [the prosecutor] and/or the grand jurors who asked questions express to the defendant, through their questions or tone of voice, any skepticism about her answers?
>
> THE WITNESS: It was made very clear that the grand jury, as well as yourself, felt that we were not getting straight answers.
>
> . . . .
>
> PROSECUTION: Did you have an understanding when . . . [Ms. Wiggan was reminded of the penalties of perjury] of why those reminders were being issued to her?
>
> THE WITNESS: In my opinion, it was extremely obvious to everybody in the room that we were not being—the grand jury was not being given the truth.

[3] Following several questions about Ms. Wiggan's credibility and demeanor before the grand jury, the district court stated to Mr. Venable, "I just want to make sure that you're answering based on things that you observed and that you're giving us your opinion, your own opinion." Mr. Venable responded, "Yes, Your Honor. Personal observation and my opinion." Additionally, the following exchanges took place over the course of the Mr. Venable's trial testimony:

> PROSECUTION: And based on the totality of the evidence that the grand jury had gathered, including the entirety of the defendant's testimony that day in her second appearance, did you find [Ms. Wiggan's] story credible?

For the reasons stated, I would affirm the district court on the issue of the testimony of grand juror Venable. In all other regards, I am pleased to join the majority opinion.

---

DEFENSE COUNSEL: Objection. Calls for a conclusion, Your Honor.

THE COURT: You know, are you talking about "you, Mr. Venable" or "you, the grand jury"?

PROSECUTION: I am talking about you, Mr. Venable.

. . . .

PROSECUTION: And with respect to the entirety of her second grand jury appearance, did you find her testimony credible?

DEFENSE COUNSEL: Objection. Calls for an opinion.

THE COURT: It does, and I'll allow it. We're talking about you, yourself, sir, not the grand jury.

. . . .

PROSECUTION: Did defendant's testimony during her grand jury appearance the second time reassure the grand jury that she was, in fact, being candid and truthful in her testimony?

DEFENSE COUNSEL: Objection. Argumentative and calls for a conclusion.

THE COURT: Well, you are talking in terms of the grand jury.

PROSECUTION: I will rephrase it.